EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica de Puerto Rico<br><br>Peticionarias<br><br>v.<br><br>Luma Energy, LLC; Luma Energy Servco, LLC<br><br>Recurridas<br>_____<br><br>Hon. Jenniffer González Colón, Gobernadora de Puerto Rico; Gobierno de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>Luma Energy, LLC; Luma Energy Servco, LLC<br><br>Recurridas<br><br>Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica de Puerto Rico<br><br>Recurridas | 2026 TSPR 85<br><br>218 DPR ___ |

Número del Caso:  CT-2025-0006
                  cons. con CT-2025-0007


Fecha:  5 de agosto de 2026


**CT-2025-0006**

Representantes legales de la parte peticionaria:

    Lcdo. Lionel E. Santana Crispín
    Lcdo. Juan Martínez Nevarez
    Lcda. Mirelis Valle Cancel
    Lcdo. Alexis G. Rivera Medina


Representantes legales de la parte recurrida:

    Lcda. Mariana Muñiz Lara
    Lcdo. Juan M. Albino López
    Lcdo. Emmanuel Porro González

Lcdo. José A. Andreu Fuentes
Lcdo. Edgardo Rivera García
Lcdo. Frank Torres Viada
Lcdo. Federico Hernández Denton

**CT-2025-0007**

Oficina del Procurador General:

Hon. Omar Andino Figueroa
Procurador General

Lcdo. Edwin B. Mojica Camps
Subprocurador General

Lcdo. Frank Rosado Méndez
Subprocurador General

Representantes legales de las recurridas:

Autoridad de Energía Eléctrica
Lcdo. Juan M. Martínez Nevárez

LUMA Energy, LLC
Lcda. Marina Muñiz Lara

Materia: Resolución del Tribunal con Votos particulares de conformidad y Voto particular disidente

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Peticionarias<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridas<br>_____<br><br>Jenniffer González Colón, Gobernadora de Puerto Rico; Gobierno de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridas<br><br>Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Recurridas | CT-2025-0006<br><br>cons. con<br><br>CT-2025-0007 |

Resolución

En San Juan, Puerto Rico, a 5 de agosto de 2026.

Examinada la totalidad de las comparecencias de las partes de epígrafe, tanto en el CT-2025-0006 como en el CT-2025-0007, se expiden ambos recursos de certificación intrajurisdiccional y, por tratar de una misma controversia, ordenamos la consolidación de los dos casos.

Se les concede a las partes peticionarias un término de treinta (30) días, contados a partir de la notificación de esta *Resolución*, para presentar su alegato, de acuerdo con la Regla 26(b) del Reglamento del Tribunal Supremo.

Además de exponer los méritos de su reclamación, las partes peticionarias deben abundar con precisión sobre los remedios o el proceso de transición que tendría lugar en caso de prevalecer en su contención.

Igualmente, se les concede a las partes recurridas un término de treinta (30) días para presentar su alegato, contados a partir del recibo de la copia del alegato de las partes peticionarias, de conformidad con la Regla 26(c) del Reglamento del Tribunal Supremo.

Lo acordó el Tribunal y certifica el Secretario de Tribunal Supremo. El Juez Asociado señor Feliberti Cintrón emitió un Voto particular de conformidad al cual se unieron la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Estrella Martínez, la Jueza Asociada Rivera Pérez y el Juez Asociado señor Candelario López. El Juez Asociado señor Estrella Martínez emitió un Voto particular de conformidad al cual se unieron la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Feliberti Cintrón, la Jueza Asociada Rivera Pérez y el Juez Asociado señor Candelario López. La Jueza Asociada Rivera Pérez emitió un Voto particular de conformidad al cual se unieron el Juez Asociado señor Feliberti Cintrón, el Juez Asociado señor Estrella Martínez y el Juez Asociado señor Candelario López.

El Juez Asociado señor Colón Pérez emitió un Voto particular disidente al cual se unieron la Jueza Presidenta Oronoz Rodríguez, el Juez Asociado señor Martínez Torres y el Juez Asociado Kolhtoff Caraballo.

El Juez Asociado señor Kolthoff Caraballo disiente y hace constar las siguientes expresiones:

> Luego de examinar cuidadosamente las comparecencias de las partes, disiento respetuosamente de la determinación de la mayoría del Tribunal de expedir estos recursos de certificación intrajurisdiccional. Mi posición no intenta adelantar criterio alguno sobre la validez de la Carta-Extensión ni sobre los méritos de las reclamaciones y reconvenciones pendientes. Sin embargo, discierno que la controversia medular de estos casos es en realidad una particular y novel, para lo que hubiera sido más conveniente el desarrollo de un expediente probatorio completo y determinaciones de hechos por el Tribunal de Primera Instancia.

Las partes demandantes sostienen que la Carta-Extensión es nula. LUMA, por su parte, alega que esta fue solicitada, aprobada y suscrita por las propias entidades gubernamentales; que actuó de buena fe y confió en las representaciones oficiales del Gobierno; y que realizó inversiones y operaciones durante más de tres años bajo la creencia de que la extensión era válida.

Nuestra jurisprudencia ha sostenido rigurosamente que quien contrata con el Gobierno debe verificar el cumplimiento de los requisitos legales aplicables y que la equidad no puede utilizarse para validar una obligación pública contraria a la ley o al orden público.[1] No obstante, los casos de autos aparentan presentar circunstancias distintas a aquellas consideradas en precedentes donde el defecto era fácilmente identificable, como la inexistencia de un contrato escrito, la expiración del acuerdo, la falta de autoridad del funcionario que lo suscribió o la prestación de servicios antes de su perfeccionamiento.

Aquí, los defectos alegados requieren interpretar contratos altamente especializados, legislación particular, el proceso de quiebra de la Autoridad de Energía Eléctrica bajo PROMESA y las competencias de diversas entidades públicas. Además, deberá determinarse quién tenía la responsabilidad de obtener cada aprobación, si las actuaciones realizadas satisfacían las exigencias legales y si LUMA podía razonablemente identificar y procurar la corrección de las supuestas irregularidades antes de comenzar la prestación del servicio.

También resulta pertinente examinar si las omisiones alegadas son susceptibles de corrección. En *Lugo v. Municipio de Guayama*, 163 DPR 208,

---

[1] *Rodríguez Ramos v. E.L.A.*, 190 DPR 448 (2014); *Landfill Technologies of Arecibo Corp. v. Gobierno Municipal de Lares*, 187 DPR 794 (2013); *ALCO Corp. v. Municipio de Toa Alta*, 183 DPR 530 (2011); *Quest Diagnostics of Puerto Rico, Inc. v. Municipio de San Juan*, 175 DPR 994 (2009); *Colón Colón v. Municipio de Arecibo*, 170 DPR 718 (2007); *Lugo Ortiz v. Municipio de Guayama*, 163 DPR 208 (2004).

(2004), y *Landfill Technologies of Arecibo Corp. v. Gobierno Municipal de Lares*, 187 DPR 794 (2013), reconocimos, en contextos particulares, que la falta de ciertas formalidades no necesariamente producía la nulidad de un contrato jurídicamente válido, aunque podía impedir temporalmente la exigibilidad de sus prestaciones. Esos precedentes no resuelven necesariamente la controversia presente, pero nos invitan a distinguir entre un defecto que imposibilita definitivamente la validez del acuerdo y una formalidad o aprobación que todavía pudiera cumplirse conforme a Derecho.

Esa evaluación cobra mayor importancia por la naturaleza esencial del servicio eléctrico y porque el propio Gobierno solicita que, aun si se decretara la nulidad, LUMA continúe operando provisionalmente hasta que se seleccione y prepare un sustituto. Tal remedio plantea interrogantes adicionales sobre la duración, el fundamento jurídico y las condiciones de esa continuidad operacional.

En consecuencia, considero que para la debida adjudicación de estas controversias hubiera sido más conveniente el desarrollo de un expediente probatorio que permitiera alcanzar el mejor balance entre la contratación gubernamental, la sana administración pública, el interés público y los derechos de las partes privadas que contratan con el Gobierno. En vista de que esa no fue la determinación de una mayoría de mis distinguidos compañeros, disiento respetuosamente.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica de Puerto Rico<br><br>Peticionarias<br><br>v.<br><br>Luma Energy, LLC; Luma Energy Servco, LLC<br><br>Recurridas | CT-2025-0006<br><br>cons. con<br><br>CT-2025-0007 |
| Hon. Jenniffer González Colón, Gobernadora de Puerto Rico; Gobierno de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>Luma Energy, LLC; Luma Energy Servco, LLC<br><br>Recurridas<br><br>Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica de Puerto Rico<br><br>Recurridas | |

Voto Particular de Conformidad emitido por el Juez Asociado Señor Feliberti Cintrón, al cual se unen la Jueza Asociada Señora Pabón Charneco, el Juez Asociado Señor Estrella Martínez, la Jueza Asociada Rivera Pérez y el Juez Asociado Señor Candelario López.

En San Juan, Puerto Rico, a 5 de agosto de 2026.

Estoy conforme con el curso de acción adoptado por la mayoría de mis compañeros de estrado. A mi juicio, lo más prudente es consolidar los recursos de certificación intrajurisdiccional, paralizar los procedimientos ante el Tribunal de Primera Instancia y atender, como cuestión de

umbral, el planteamiento sobre la presunta nulidad del documento (Carta-Extensión)[1] que extendió indefinidamente o sin fecha cierta el término de vigencia del *Puerto Rico Transmission and Distribution System Supplemental Terms Agreement* (contrato suplementario). La determinación de ese asunto, en primera instancia, es indispensable para delimitar adecuadamente el marco jurídico de dicha controversia.

**Nada impide que, en esta etapa de los procedimientos, expidamos los recursos de certificación intrajurisdiccional presentados. Proceder de ese modo le permite a este Tribunal**, como máximo intérprete del ordenamiento jurídico puertorriqueño, cumplir cabalmente con su deber de interpretar las leyes y **brindar certeza jurídica sobre un asunto novel de alto interés público y de trascendental importancia, relacionado con el sistema de energía eléctrica de Puerto Rico.**

A fin de cuentas, **una intervención judicial tardía difícilmente puede satisfacer a plenitud los fines de la justicia. Sin entrar a discutir en estos momentos los méritos de la misma, resolver oportunamente la controversia sobre la validez de la Carta-Extensión responde, además, al principio cardinal de economía procesal, pues evita que las partes inviertan tiempo y recursos en un litigio potencialmente**

---

[1] En lo sucesivo, se aludirá al documento en cuestión como "Carta-Extensión", a fin de mantener uniformidad con la nomenclatura utilizada por la Autoridad de Alianzas Público Privadas (AAPP) y la Autoridad de Energía Eléctrica (AEE) (en conjunto, P3), así como por la Gobernadora de Puerto Rico, Hon. Jenniffer González Colón, y el Gobierno de Puerto Rico (en conjunto, Gobierno), en sus recursos de certificación intrajurisdiccional (CT-2025-0006 y CT-2025-0007, respectivamente).

**extenso y oneroso, con el consiguiente impacto económico al erario.** Así pues, **debemos resolver primero, y en estricto derecho, aquella cuestión cuya adjudicación tiene el potencial de definir el curso ulterior del litigio.**

## I.

Los recursos de certificación intrajurisdiccional presentados ante nosotros (CT-2025-0006 y CT-2025-0007) versan sobre varias demandas presentadas ante el foro primario contra LUMA Energy, LLC y LUMA Energy Servco, LLC (en conjunto, LUMA). Dichas demandas fueron instadas, por un lado, por la Autoridad de Alianzas Público Privadas (AAPP) y la Autoridad de Energía Eléctrica (AEE) (en conjunto, P3) y, por otro, por la Gobernadora de Puerto Rico, Hon. Jenniffer González Colón, y el Gobierno de Puerto Rico (en conjunto, Gobierno). En esencia, tanto P3 como el Gobierno solicitan que se declare nula la Carta-Extensión mediante la cual se extendió indefinidamente o sin fecha cierta la vigencia del contrato suplementario, en virtud del cual LUMA maneja actualmente el sistema de transmisión y distribución eléctrica de Puerto Rico.[2] Ello, con el propósito de culminar

---

[2] Cabe señalar que P3 presentó ante el Tribunal de Primera Instancia una *Demanda jurada de sentencia declaratoria e injunction preliminar*. En ella, además de solicitar la nulidad de la Carta-Extensión del 30 de noviembre de 2022, solicitó la concesión de determinados remedios interdictales dirigidos a que LUMA Energy, LLC y LUMA Energy Servco, LLC (en conjunto, LUMA) proveyeran de inmediato los documentos y la información que entendía indispensable para garantizar una transición efectiva en la operación del sistema de transmisión y distribución de energía eléctrica. Véase *Demanda jurada de sentencia declaratoria e injunction preliminar* presentada el 11 de diciembre de 2025, Caso Núm. SJ2025CV11093, entrada núm. 1 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).

En cuanto a los remedios interdictales solicitados por P3, surge del SUMAC que el 9 de julio de 2026 el foro primario emitió una *Sentencia*

la relación contractual con LUMA y dar paso a una transición ordenada hacia un nuevo operador privado.

Tras instar las demandas, P3 y el Gobierno acudieron ante este Tribunal mediante sus respectivos recursos de certificación intrajurisdiccional. Luego de varios trámites no meritorios detallar, y tras concederles a P3 y al Gobierno un término de quince (15) días para que se expresaran sobre la procedencia de las certificaciones intrajurisdiccionales solicitadas ante las reconvenciones instadas por LUMA en el

---

*parcial* mediante la cual resolvió que no procedía su expedición, por entender que: (1) P3 contaba con remedios adecuados en ley mediante el procedimiento ordinario; (2) los remedios interdictales solicitados estaban dirigidos a obtener la producción de documentos, lo que no procede por la vía del injunction, y (3) los remedios podrían concederse si P3 prevalecía en la acción ordinaria. *Sentencia parcial* emitida el 9 de julio de 2026, Caso Núm. SJ2025CV11093, entrada núm. 40 del SUMAC.

Por su parte, el Gobierno presentó ante el Tribunal de Primera Instancia una *Demanda* sobre sentencia declaratoria en la que también solicitó, entre otros remedios, que se declarara la nulidad de la Carta-Extensión del 30 de noviembre de 2022. No obstante, a diferencia de P3, no acumuló una causa de acción de naturaleza interdictal. *Demanda* presentada el 16 de diciembre de 2025, Caso Núm. SJ2025CV11202, entrada núm. 1 del SUMAC.

Tribunal de Primera Instancia,[3] ambas partes presentaron sus escritos en torno a ese asunto el 14 de julio de 2026.[4]

Cabe señalar que, el 29 de junio de 2026, previo a que P3 y el Gobierno comparecieran en cumplimiento de término concedido, LUMA presentó sus escritos en oposición a los recursos de certificación intrajurisdiccional.[5]

A continuación, se incluye un resumen de los hechos medulares y de los planteamientos que dieron lugar a la presentación de los recursos de certificación ante nuestra consideración.

### A.

El 22 de junio de 2020, la AAPP, en calidad de administrador, la AEE, como dueña, y LUMA, como compañía

---

[3] En la reconvención presentada contra el Gobierno, LUMA formula las causas de acción siguientes: (1) sentencia declaratoria sobre interferencia con el *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (T&D OMA); (2) sentencia declaratoria sobre abuso del Poder Ejecutivo; (3) sentencia declaratoria sobre mal uso de fondos públicos; (4) dolo en la ejecución del contrato; (5) mala fe contractual, y (6) negligencia en el desempeño de funciones. *Contestación a demanda y reconvención* presentada el 23 de junio de 2026, Caso Núm. SJ2025CV11202, entrada núm. 32 del SUMAC.

De otra parte, en la reconvención presentada contra P3, LUMA formula diversas causas de acción, entre las que figuran las siguientes: (1) cumplimiento específico con el procedimiento de resolución de disputas establecido en el Art. 15 del T&D OMA; (2) dolo en la formación del contrato; (3) *culpa in contrahendo*; (4) dolo en la ejecución del contrato; (5) mala fe contractual; (6) enriquecimiento sin causa; (7) sentencia declaratoria sobre abuso del Poder Ejecutivo, y (8) sentencia declaratoria sobre mal uso de fondos públicos. *Contestación a "demanda jurada de sentencia declaratoria e injunction preliminar" y reconvención* presentada el 23 de junio de 2026, Caso Núm. SJ2025CV11093, entrada núm. 17 del SUMAC.

[4] En particular, el 14 de julio de 2026, P3 presentó una *Moción en cumplimiento con "resolución" sobre la procedencia del recurso de certificación intrajurisdiccional* (CT-2025-0006) y el Gobierno presentó una *Moción en cumplimiento de resolución* (CT-2025-0007).

[5] Posteriormente, el 23 de julio de 2026, LUMA presentó dos escritos titulados *Oposición a "moción en cumplimiento de resolución"* (CT-2025-0006) y *Oposición a "moción en cumplimiento con resolución sobre la procedencia del recurso de certificación intrajurisdiccional"* (CT-2025-0007).

operadora, suscribieron el contrato titulado *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (T&D OMA o contrato principal). Según exponen P3 y el Gobierno en sus respectivos recursos de certificación intrajurisdiccional, dicho acuerdo constituye un contrato de alianza público privada mediante el cual LUMA asumiría la gestión, operación y mantenimiento del sistema de transmisión y distribución eléctrica de Puerto Rico, conforme a la Ley Núm. 29-2009, según enmendada, conocida como Ley de Alianzas Público Privadas (Ley Núm. 29-2009)[6] y la Ley Núm. 120-2018, según enmendada, conocida como Ley para Transformar el Sistema Eléctrico de Puerto Rico (Ley Núm. 120-2018).[7]

P3 y el Gobierno sostienen que el T&D OMA contemplaba una vigencia inicial de quince (15) años a partir de su entrada en vigor, con la posibilidad de extensiones subsiguientes, siempre que éstas se mantuvieran dentro de los parámetros de duración establecidos en la Ley Núm. 29-2009. Asimismo, señalan que el contrato principal disponía que el control operacional total sería transferido a LUMA una vez se cumplieran una serie de requisitos (*Service Commencement Date Conditions*), entre ellos, que la AEE saliera del proceso de quiebra bajo el Título III del Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA).[8] Además,

---

[6]   27 LPRA sec. 2601 *et seq.*

[7]   22 LPRA sec. 1112 *et seq.*

[8]   48 USC sec. 2101 *et seq.*

aducen que el T&D OMA incorporó un conjunto de métricas de desempeño dirigidas tanto a incentivar la gestión de LUMA como a evaluar el cumplimiento de sus obligaciones contractuales. Entre dichas métricas se encuentran las categorías principales de desempeño siguientes: (1) la satisfacción de los clientes, (2) la operación del sistema de transmisión y distribución de manera confiable, seguro y conforme al marco regulatorio aplicable y (3) el desempeño financiero de LUMA.

No obstante, debido a que la AEE permanecía sujeta al procedimiento de quiebra bajo el Título III de PROMESA, no era posible satisfacer los *Service Commencement Date Conditions* requeridos para la entrada en vigor del T&D OMA. Por ello, las partes acordaron formalizar un convenio adicional que regularía temporeramente sus relaciones jurídicas hasta que pudiera activarse el contrato principal. Así, el mismo 22 de junio de 2020 suscribieron el denominado contrato suplementario. Bajo este último contrato, se comenzaría a brindar el servicio acordado en el T&D OMA de manera temporera, hasta un periodo máximo de dieciocho (18) meses, comenzando a partir del 1 de junio de 2021.[9] A esos

---

[9] Cabe destacar que el *Supplemental Agreement Effective Date* quedó formalmente establecido el 1 de junio de 2021, mediante el *Limited Waiver* ejecutado por la AAPP, la AEE y LUMA en esa misma fecha, en el cual las partes acordaron expresamente que tanto el *Supplemental Agreement Effective Date* como el *Interim Period Service Commencement Date* sería el 1 de junio de 2021. Véanse: *Exhibit* núm. 3 (*Limited Waiver*) de la *Demanda jurada de sentencia declaratoria e injunction preliminar* presentada por P3 el 11 de diciembre de 2025, Caso Núm. SJ2025CV11093, entrada núm. 1 del SUMAC y Anejo núm. 2 (*Limited Waiver*) de la *Demanda* presentada por el Gobierno el 16 de diciembre de 2025, Caso Núm. SJ2025CV11202, entrada núm. 1 del SUMAC.

efectos, la Sección 7.1 del contrato suplementario establecía lo siguiente:

> "This Supplemental Agreement and the [T&D OMA] Agreement shall automatically terminate without further action by Operator, and without need for a court decision or arbitral award confirming such termination, in the event that the Service Commencement Date does not occur on or prior to the date that is eighteen (18) months after the Supplemental Agreement Effective Date (such date, the "Interim Period Termination Date"), which Interim Period Termination Date may, if requested by Administrator, be extended by the mutual agreement of the Parties prior to the then-current Interim Period Termination Date."

En virtud de esa disposición, el término de dieciocho (18) meses culminaría el 30 de noviembre de 2022, fecha en que habría de producirse la terminación automática de los contratos, salvo que las partes acordaran una extensión del término. Precisamente el 30 de noviembre de 2022, la AAPP, la AEE y LUMA suscribieron la Carta-Extensión, mediante la cual se enmendó el contrato suplementario de la manera siguiente:

> "In accordance with the express terms of Section 7.1 (a) of the Supplemental Agreement, Administrator hereby requests an extension of the Interim Period Termination Date to the date on which the following Service Commencement Date Conditions shall have been satisfied or waived: (i) the Title III Exit shall have occurred; and (ii) the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator."

Según plantea P3 y el Gobierno, la Carta-Extensión sustituyó la terminación automática de dieciocho (18) meses por un plazo indefinido condicionado a la ocurrencia de dos eventos: (1) la salida de la AEE del procedimiento de quiebra bajo PROMESA y (2) que el plan de ajuste bajo el Título III

y la orden emitida por el Tribunal de Título III que lo confirme resulten razonablemente aceptables para LUMA. Así pues, sostienen que la Carta-Extensión enmendó los términos y condiciones del contrato suplementario, dejó de fijar una fecha cierta de terminación y colocó la continuación del contrato bajo criterios dependientes de la voluntad exclusiva de LUMA. A su juicio, ello eliminó *de facto* la facultad resolutoria que el contrato suplementario confería expresamente a la AAPP y a la AEE, convirtiéndolo, para todos los efectos prácticos, en un contrato de tiempo indefinido.

Asimismo, P3 y el Gobierno plantean que la Carta-Extensión incumplió ciertos requisitos esenciales establecidos tanto en la Ley Núm 29-2009 como en la Ley Núm. 120-2018 para el perfeccionamiento de este tipo de acuerdos. En síntesis, alegan que: (1) conforme a la Sec. 10(b) de la Ley Núm. 120-2018,[10] la extensión sólo podía aprobarse mediante el voto afirmativo de ambos representantes del interés público y que, al éstos haberse abstenido, dichos votos se consideran como votos en contra, por lo que la extensión nunca fue válidamente aprobada; (2) la Carta-Extensión se otorgó sin obtener el "Certificado de Cumplimiento de Energía" requerido por la Sec. 5(g) de la Ley Núm. 120-2018[11] como condición indispensable para otorgar o perfeccionar cualquier

---

[10]   22 LPRA sec. 1120.

[11]   22 LPRA sec. 1115(g).

modificación a las Transacciones de la AEE,[12] y (3) la Carta-Extensión es nula por cuanto contraviene la Ley Núm. 29-2009 al ignorar los límites temporales que ésta impone mediante una prolongación indefinida del contrato suplementario y, además, por no haber sido sometida para aprobación legislativa, según exige expresamente el Art. 10(e) de dicho estatuto.[13]

El Gobierno plantea también en su recurso de certificación intrajurisdiccional que la aprobación por legislación de cualquier extensión de una alianza público privada que exceda los límites temporales de la Ley Núm. 29-2009 requiere la presentación de un proyecto de ley para la consideración de la Gobernadora, quien, en el ejercicio de sus **prerrogativas constitucionales**, podrá vetarlo o aprobarlo. Así pues, entiende que, al pretender aprobar una extensión indefinida del contrato suplementario mediante la Carta-Extensión, se usurparon las prerrogativas constitucionales de la Gobernadora.[14]

---

[12] La Ley Núm. 120-2018, según enmendada, conocida como Ley para Transformar el Sistema Eléctrico de Puerto Rico (Ley Núm. 120-2018), 22 LPRA sec. 1112 *et seq.*, define el término "Transacción(es) de la AEE" como:

> Cualquiera y toda transacción mediante la cual la AEE o el Gobierno de Puerto Rico establezca una o más alianzas con respecto a cualquier función, servicio o instalación de la AEE o un contrato de venta de los activos de la AEE relacionados a la generación de energía, y que se lleve a cabo conforme a las disposiciones de [la Ley Núm. 29-2009, según enmendada, conocida como Ley de Alianzas Público Privadas (Ley Núm. 29-2009), 27 LPRA sec. 2601 *et seq.*, y la Ley Núm. 120-2018]. 22 LPRA sec. 1112(m).

[13] 27 LPRA sec. 2609(e).

[14] Según provisto, entre los deberes, funciones y atribuciones de la Gobernadora de Puerto Rico figura el de cumplir y hacer cumplir las leyes. Art. IV, Sec. 4, Const. PR, LPRA Tomo 1, ed. 2023, pág. 424. En esa

Por otro lado, P3 puntualiza en su recurso de certificación intrajurisdiccional que, previo a la firma de la Carta-Extensión, la AAPP sometió la propuesta a la Junta de Supervisión Fiscal (Junta) para su revisión bajo la política de contratos adoptada al amparo de la Sec. 204(b)(2) del Título II de PROMESA.[15] No obstante, precisa que, aunque la Junta concluyó que la enmienda propuesta estaba *Approved with Observations*, su análisis se limitó exclusivamente al cumplimiento con PROMESA y que no evaluaba: "(i) compliance with contracting requirements under applicable laws, rules, and regulations, both federal and local; and (ii) compliance with applicable laws, rules, and regulations governing procurement activities, both federal and local." Así, sostiene que la Carta-Extensión nunca fue revisada o aprobada por un organismo facultado bajo el derecho local.

Por su parte, LUMA aduce en sus comparecencias en oposición a los recursos de certificación intrajurisdiccional que la realidad material que tanto P3 como el Gobierno pretenden soslayar es que el decreto de nulidad que solicitan

___

faena, posee un interés muy particular en asegurar que toda actuación con impacto directo sobre la contratación gubernamental se ajuste estrictamente al ordenamiento jurídico. Esa facultad no es meramente administrativa, sino una responsabilidad constitucional orientada a garantizar el cumplimiento de las leyes, proteger el interés público y salvaguardar los recursos del Estado. Ese deber adquiere una dimensión aún mayor tratándose del servicio de energía eléctrica, el cual se ha reconocido como uno de los servicios básicos y esenciales sobre los cuales se fundamenta el desarrollo sostenible de Puerto Rico. Véase, por ejemplo, el Art. 1.3 de la Ley Núm. 17-2019, según enmendada, conocida como Ley de Política Pública Energética de Puerto Rico. 22 LPRA sec. 1141b. Por ello, todas las funciones relacionadas con la generación, transmisión, distribución, y comercialización de la energía eléctrica, así como la planificación y el control del sistema, son de interés público e importancia estratégica para toda función privada o gubernamental. Íd.

[15]   48 USC sec. 2144(b)(2).

no entraña una mera controversia sobre la interpretación de estatutos o del lenguaje contractual, sino que producirá repercusiones profundas e inmediatas que son inseparables del ejercicio de adjudicar el reclamo de nulidad. Así las cosas, sostiene que la decisión en este caso impactaría, desde el primer día, el servicio esencial de electricidad y la estabilidad del sistema de energía eléctrica en plena temporada de huracanes; pondría en entredicho la credibilidad contractual del Gobierno ante futuros contratantes de alianzas público privadas; entorpecería el proceso de reestructuración de deudas de la AEE e interrumpiría, y hasta detendría, cientos de proyectos de mejoras capitales que LUMA tiene en curso, la mayoría de los cuales cuentan con financiamiento de fondos federales para reparar la infraestructura eléctrica y cuya disponibilidad estaría en juego. Todo ello ocurriría sin que el Gobierno hubiera propuesto un plan de transición ni identificado otro operador, lo que, según LUMA, revela que no ha ponderado adecuadamente las consecuencias de sus actos.

Asimismo, LUMA sostiene que los recursos de certificación intrajurisdiccional presentados tampoco satisfacen los criterios para su expedición y que no existe fundamento para preterir los trámites judiciales ordinarios so pretexto de la urgencia del Poder Ejecutivo por instrumentar una promesa política en contra de LUMA, la cual resulta incompatible con las actuaciones, representaciones y compromisos contractuales del propio Gobierno.

De igual forma, argumenta que la presunta controversia creada por P3 y el Gobierno, tres años después de que las partes extendieran sus compromisos contractuales mediante la Carta-Extensión, comprende cuestiones complejas que deben ventilarse inicialmente en el foro primario. Entre ellas, identifica controversias relacionadas con la intención de las partes contratantes; las circunstancias que rodearon la aprobación de la Carta-Extensión; la intención del Gobierno en el 2022 al representarle a LUMA que la extensión del contrato suplementario era válida y que se aprobó conforme al derecho aplicable, acorde con una opinión legal gestionada por la AAPP; las razones y circunstancias del cambio de postura del Gobierno sobre la validez de la Carta-Extensión y su aprobación –incluyendo declaraciones juradas inconsistentes con declaraciones anteriores-, y la conducta posterior de P3 y el Gobierno que convalidaron la referida extensión por más de tres años.

Añade que el caso plantea controversias sobre la procedencia de un proceso de transición en caso de decretarse la nulidad de la Carta-Extensión y sobre los términos en que ésta habría de desarrollarse, incluyendo si se le podría exigir a LUMA continuar operando el sistema de transmisión y distribución de energía eléctrica mientras se materializa la transición, así como la forma en que se sufragarían los costos multimillonarios que dicho proceso implicaría. En consecuencia, sostiene que, todas esas controversias

requieren ponderación, discusión y prueba ante el Tribunal de Primera Instancia antes de la intervención de este Tribunal.

Finalmente, LUMA argumenta que las solicitudes de certificación intrajurisdiccional y la posición de P3 y del Gobierno de que la extensión del contrato es nula conllevaría que este Foro precipite un caos en el servicio de energía eléctrica en un momento crítico en el que todavía la AEE continua en un proceso de reestructuración. Añade que decretar la nulidad del contrato sin el beneficio de una vista evidenciaria le privaría de un interés propietario sin el debido proceso de ley.

## II.

### A. La certificación intrajurisdiccional

El Art. 3.002(f) de la Ley Núm. 201-2003, según enmendada, conocida como Ley de la Judicatura [del Gobierno de Puerto Rico] de 2003 (Ley de la Judicatura), 4 LPRA sec. 24s(f), establece:

> Mediante auto de certificación a ser expedido discrecionalmente, *motu proprio* o a solicitud de parte, [el Tribunal Supremo] podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto pendiente ante el Tribunal de Primera Instancia cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, **se planteen cuestiones noveles de derecho**, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución de Puerto Rico o de la Constitución de Estados Unidos. (Énfasis suplido). Véase, además, Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V.

Así pues, como se menciona arriba, el recurso de certificación intrajurisdiccional constituye un mecanismo

procesal de carácter discrecional el cual puede ser expedido por este Tribunal, a iniciativa propia o a solicitud de parte, para elevar de inmediato ante su consideración todo asunto pendiente ante los foros inferiores cuando se plantean, entre otros factores, **cuestiones noveles de derecho** o de alto interés público que incluyan un asunto constitucional sustancial al amparo de la Constitución de Puerto Rico o de Estados Unidos. Art. 3.002(f) de la Ley de la Judicatura, *supra*. Véanse también: Rosario Rodríguez v. Rosado Colomer *et al.*, 208 DPR 419, 426 (2021); Pierluisi *et al.* v. CEE *et al.*, 204 DPR 841, 853 (2020); P.I.P. v. E.L.A. *et al.*, 186 DPR 1, 9 (2012).

En el pasado hemos expresado que es el mecanismo adecuado para atender asuntos que requieren una solución urgente, ya sea porque afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención. Rosario Rodríguez v. Rosado Colomer *et al.*, *supra*, pág. 427. Cabe destacar que el recurso de certificación intrajurisdiccional es de naturaleza excepcional ante la política del ordenamiento jurídico de esperar a que los casos maduren durante el trámite ordinario para evitar que este Foro lo atienda a destiempo. U.P.R. v. Laborde Torres y otros I, 180 DPR 253, 272 (2010). No obstante, hemos resuelto que el recurso de certificación intrajurisdiccional cumple el propósito de adelantar el trámite judicial ordinario en los casos que, por su importancia y envergadura ameritan

ser resueltos prontamente. Presidente de la Cámara v. Gobernador, 167 DPR 149, 160 (2006).

Ahora bien, debido a su naturaleza excepcional, al evaluar el recurso de certificación intrajurisdiccional, este Foro debe considerar los factores siguientes: (1) la urgencia; (2) la etapa en que se encuentran los procedimientos; (3) la necesidad que pueda presentarse de recibir prueba, y (4) la complejidad de la controversia. Rosario Rodríguez v. Rosado Colomer et al., supra, pág. 428 (citando a Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 849 (2014)).

En el presente caso concurren los criterios que justifican la expedición de los recursos de certificación intrajurisdiccional. En primer lugar, existe un claro elemento de urgencia, ya que la controversia incide sobre la operación del sistema de transmisión y distribución del servicio de energía eléctrica, un servicio público esencial cuyo funcionamiento tiene un impacto directo sobre el interés público y el bienestar de la ciudadanía. En consecuencia, la pronta adjudicación del asunto resulta necesaria para brindar certeza jurídica sobre la validez de la Carta-Extensión que enmendó el contrato suplementario bajo el cual se presta dicho servicio. En segundo lugar, los procedimientos se encuentran en una etapa de fácil disposición, por lo que su consideración no ocasionaría dilaciones indebidas ni afectaría el curso ordenado del procedimiento judicial. En tercer lugar, la controversia principal no requiere la presentación de prueba, pues

el asunto planteado es eminentemente jurídico. Finalmente, la controversia también requiere definir, entre otras cosas, el alcance y la interacción de dos estatutos de singular importancia para la contratación pública y las alianzas público privadas, específicamente en el contexto de la validez de una Carta-Extensión que modificó el contrato suplementario mediante el cual se opera el sistema de transmisión y distribución del servicio de energía eléctrica.

La resolución de éstas y otras interrogantes tendrá un efecto significativo no solo para las partes, sino también para la administración de futuros contratos gubernamentales y para la certeza jurídica en un área de evidente interés público. **Estas circunstancias, consideradas en conjunto, justifican que ejerzamos nuestra facultad de atender los recursos de certificación intrajurisdiccional presentados.**

**B. La sentencia declaratoria**

La sentencia declaratoria es un mecanismo disponible aun cuando existan otros remedios y tiene la eficacia de una sentencia o resolución definitiva. DACO v. LUMA y otros, 2025 TSPR 126, 217 DPR ___ (2025); Rosario Rodríguez v. Rosado Colomer *et al.*, *supra*, pág. 428 (citando a Senado de PR v. ELA, 203 DPR 62, 71 (2019)). En el pasado, este Tribunal la ha definido como un "mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita". DACO v. LUMA y otros, *supra*; Rosario Rodríguez v. Rosado Colomer

*et al.*, *supra*, pág. 427 (citando a <u>Senado de PR v. ELA</u>, *supra*); <u>Beltrán Cintrón</u> *et al*. v. <u>ELA</u> *et al*., 204 DPR 89, 109 (2020) (citando a <u>Senado de PR v. ELA</u>, *supra*, pág. 71).

Así pues, este remedio extraordinario puede dictarse en todo proceso judicial en el que "[l]os hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que medie lesión previa de los mismos con el propósito de disipar la incertidumbre jurídica y contribuir a la paz social". <u>DACO v. LUMA y otros</u>, *supra* (citando a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta ed., San Juan, Ed. LexisNexis, 2017, pág. 623).

A su vez, el mecanismo de la sentencia declaratoria permite que toda persona cuyos derechos se vean afectados por un estatuto, una ordenanza municipal, un contrato o una franquicia solicite una determinación sobre cualquier divergencia relacionada con su interpretación o validez, así como una declaración de los derechos, estados u otras relaciones jurídicas que de éstos se deriven. <u>DACO v. LUMA y otros</u>, *supra*. Véase, además, Regla 59.2 de Procedimiento Civil, 32 LPRA Ap. V. En cuanto a los contratos, éstos pueden interpretarse antes o después de ser infringidos. <u>Íd.</u>

De hecho, la declaración de nulidad de un documento constituye una de las formas más antiguas de sentencia declaratoria. <u>Llopiz v. Arburúa</u>, 72 DPR 531, 536 (1951). En ese sentido, una divergencia sobre el alcance de una

cláusula contractual puede ser considerada, dilucidada y adjudicada mediante sentencia declaratoria, sin que la disponibilidad de otros remedios represente un obstáculo para ello. Arecibo Bldg. Corp. v. Tribunal Superior, 101 DPR 720, 725 (1973). Asimismo, mediante este mecanismo, puede obtenerse una determinación sobre cualquier divergencia relativa a un contrato escrito y sobre los derechos, estados y demás relaciones jurídicas que de éste se deriven. Llopiz v. Arburúa, *supra*, págs. 535-536.

## III.

**Considero que este Tribunal debe expedir los recursos de certificación intrajurisdiccional presentados ante nosotros a los únicos fines de dilucidar, en estricto derecho y, en primer término, la validez de la Carta-Extensión impugnada. Este asunto constituye el eje central del litigio y, en última instancia, su resolución corresponderá a este Foro. Por ello, procede certificar los casos presentados y paralizar los procedimientos ante el Tribunal de Primera Instancia, limitando la certificación a la determinación de la validez de dicha Carta-Extensión. El resultado de esa decisión será el cimiento sobre el cual descansarán todas las reclamaciones y defensas formuladas por las partes. Es decir, resolver la validez de la Carta-Extensión constituye la premisa indispensable para determinar el curso que deberá seguir el litigio.**

Si, por ejemplo, este Tribunal concluyera que la Carta-Extensión es válida y eficaz, el litigio quedaría

esencialmente resuelto. Por el contrario, si se determina que la Carta-Extensión es nula, correspondería devolver el caso al foro primario para la continuación de los procedimientos bajo ese marco normativo, incluyendo el descubrimiento de prueba, la consideración de las reconvenciones presentadas por LUMA, la adjudicación de las reclamaciones que puedan existir y cualquier otra controversia fáctica pendiente, relacionada, por ejemplo, con la implementación de una transición ordenada hacia otro operador del sistema energético, de ser ese el caso.

**Esperar a que concluya un litigio potencialmente extenso antes de atender la controversia jurídica central carece de sentido práctico y procesal. Ello implicaría meses, e incluso años, de litigación contenciosa, con los elevados costos que ello conlleva para las partes y, en este caso, para el erario, incluyendo el posible desembolso de cuantiosos fondos públicos. Todo ello para que, eventualmente, el caso llegue ante este Foro, momento en el cual la resolución definitiva del mismo dependerá, en gran medida, de nuestra determinación sobre la misma cuestión jurídica que hoy se nos plantea.**

No debe perderse de perspectiva que la Carta-Extensión en controversia no afecta únicamente los intereses de las partes litigantes. **Se trata de un acuerdo cuya ejecución repercute directamente sobre la prestación de un servicio público <u>esencial</u>, como lo es el servicio eléctrico, para el bienestar de la población.** En consecuencia, **la incertidumbre prolongada respecto a su validez trasciende el ámbito privado**

**del litigio y alcanza a miles de ciudadanos, hospitales, escuelas, comercios, entre otros, que dependen diariamente de un servicio continuo, seguro y eficiente.** La ciudadanía merece que las controversias jurídicas fundamentales relacionadas con la prestación de servicios básicos esenciales se resuelvan con la mayor certeza, prontitud y uniformidad posible. Los ciudadanos son, en última instancia, quienes soportan las consecuencias de litigios prolongados y las decisiones que pudieran alterar la continuidad o calidad de un servicio indispensable para la vida cotidiana, el desarrollo económico y el bienestar colectivo.

Si, por ejemplo, a modo de excepción y por vía del recurso de *certiorari*, (1) se puede revisar una resolución interlocutoria que adjudica de forma dispositiva un incidente en un proceso judicial antes de que recaiga una sentencia final, entre otras instancias, cuando el caso reviste interés público o cuando esperar hasta la apelación constituiría un fracaso de la justicia;[16] y si, de igual forma, (2) se puede revisar una resolución administrativa parcial que adjudica de manera definitiva los derechos de determinadas partes antes de que concluya el procedimiento administrativo,[17] no se advierte razón alguna para que, por analogía, en el presente caso y mediante el recurso de certificación

---

[16] Véanse: Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V; Allio v. Santiago Chardón, 2026 TSPR 13, págs. 9-13, 217 DPR __ (2026).

[17] Véase, Ramos Sánchez v. BPPR *et al.*, 2026 TSPR 63, 218 DPR __ (2026).

intrajurisdiccional este Tribunal deba esperar a que el Tribunal de Primera Instancia emita una determinación final sobre la totalidad del pleito y, posteriormente, a que el Tribunal de Apelaciones ejerza su función revisora para entonces este Tribunal intervenir. Con mayor razón cuando **el asunto novel aquí planteado es de estricto derecho, está revestido de un alto interés público y requiere una pronta solución, circunstancias que justifican el ejercicio de nuestra facultad discrecional para expedir los recursos de certificación intrajurisdiccional ante nos.** La misma lógica que ha guiado nuestra intervención anticipada en los primeros dos escenarios debe prevalecer aquí.

Por todo lo anterior, estimo que corresponde a este Foro consolidar los recursos de certificación intrajurisdiccional que se presentaron ante nosotros, paralizar los procedimientos ante el foro primario y expedir dichos recursos para resolver, inicialmente y como cuestión estrictamente de derecho, la controversia novel y de alto interés público relativa a la validez de la Carta-Extensión. Una vez emitida nuestra determinación, procede entonces, **y sólo entonces**, devolver el caso al Tribunal de Primera Instancia para que continúen los procedimientos que correspondan conforme al marco jurídico delineado y a las instrucciones impartidas por este Tribunal.

En estas circunstancias, y dada la naturaleza dispositiva de la controversia novel en cuestión, así como la importancia pública del asunto, no existe razón para diferir nuestra

intervención. La economía procesal, el uso eficiente de los recursos judiciales y públicos, y la necesidad de ofrecer una respuesta definitiva sobre la cuestión central de los casos presentados favorecen que ejerzamos nuestra facultad de certificación en este momento. Por ello, estoy conforme en que lo procedente es certificarlos y resolver de inmediato el asunto relativo a la validez de la Carta-Extensión en controversia.

Para concluir, **debe quedar meridianamente claro que mi posición es en cuanto al aspecto <u>procesal</u> de nuestro manejo de los casos que han sido presentados y no en cuanto a los <u>méritos</u> de la controversia principal envuelta en los mismos y sobre la cual no pretendo adelantar criterio al respecto en estos momentos. Sin embargo, no tiene sentido alguno que el litigio de estos casos se prolongue innecesariamente, cuando este Tribunal podría decidir la controversia central de los mismos (un asunto puramente de derecho que al final del día corresponderá, inevitablemente, ser resuelto por nosotros), antes que las partes continúen litigando los casos en lo que muy bien podría culminar siendo un ejercicio fútil, dependiendo de lo que finalmente resolvamos.**

Por las razones que anteceden, estoy **<u>conforme</u>** con el curso de acción adoptado por la mayoría de este Tribunal.


                              Roberto Feliberti Cintrón
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Peticionarias<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridas<br>_____<br><br>Jenniffer González Colón, Gobernadora de Puerto Rico; Gobierno de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridas<br><br>Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Recurridas | CT-2025-0006<br><br>cons. con<br><br>CT-2025-0007 |

Voto particular de conformidad emitido por el Juez Asociado Señor ESTRELLA MARTÍNEZ, al cual se unen la Jueza Asociada Señora PABÓN CHARNECO, el Juez Asociado Señor FELIBERTI CINTRÓN, la Jueza Asociada RIVERA PÉREZ y el Juez Asociado señor CANDELARIO LÓPEZ.

En San Juan, Puerto Rico, a 5 de agosto de 2026.

Hoy elevamos ante nuestra atención una controversia novel y, sobre todo, de altísimo interés público: la posible nulidad del contrato para la operación del sistema

de transmisión de energía eléctrica, pactado entre el Gobierno de Puerto Rico y la empresa LUMA Energy. Como una mayoría de este Tribunal opta hoy por declarar ha lugar la certificación de los recursos en los que se solicita resolver, como cuestión de umbral, esta controversia de estricto derecho, imparto mi conformidad. Me explico.

En esencia, ambas solicitudes de certificación intrajurisdiccional que motivan la presente *Resolución* tienen su origen en dos pleitos que versan sobre la nulidad de la relación contractual entre el Gobierno de Puerto Rico y la empresa LUMA Energy.

En términos sencillos, la relación contractual entre las partes nació el 22 de junio de 2020 cuando la Autoridad para las Alianzas Público-Privadas (AAPP) y la Autoridad de Energía Eléctrica (AEE) suscribieron junto a LUMA Energy un *Transmission and Distribution System Operation and Maintenance Agreement*, contrato principal, y un *Transmission and Distribution System Supplemental Terms Agreement*, acuerdo suplementario. Este último fue pactado entre las partes para regir la relación <u>antes</u> de la entrada en vigor del contrato principal, la cual dependía, entre otras cosas, de la culminación del proceso de quiebra de la AEE bajo el Título III de la ley federal *Puerto Rico Oversight, Management, and Economic Stability Act* (PROMESA), 48 USC sec. 2101 *et seq.* De esa forma, LUMA Energy asumió la operación del sistema de transmisión de

energía eléctrica de manera transitoria durante ese periodo intermedio.

En la sección 7.1 del acuerdo suplementario, se dispuso que ambos contratos serían resueltos automáticamente si la fecha de comienzo del servicio de energía eléctrica no ocurría dieciocho (18) meses después de la fecha de la entrada en vigor del acuerdo suplementario. Para efecto de ambos contratos, las partes también firmaron un relevo limitado en el que establecieron formalmente que la fecha de entrada en vigor del acuerdo suplementario -y del periodo intermedio- era el 1 de junio de 2021.

Luego, el 30 de noviembre de 2022, mediante una carta, la AAPP, la AEE y LUMA Energy consignaron que, conforme a la sección 7.1(a) del acuerdo suplementario, LUMA Energy solicitaba una extensión de la fecha de terminación del periodo intermedio en el que se debían presentar las condiciones para la entrada en vigor del acuerdo principal. Por ello, en lugar de una fecha límite para determinar cuándo concluiría el periodo intermedio y entraría en vigor el contrato principal, se establecieron como nuevas condiciones que la AEE culminara el proceso de quiebra bajo el Título III de la ley federal PROMESA y que el plan de ajuste fuera razonablemente aceptable para LUMA Energy.

Por una parte, para la AAPP y la AEE la carta que extendió la vigencia del acuerdo suplementario entre las partes debe ser declarada nula porque: (1) eliminó la protección resolutoria que le pertenecía a la AAPP y la AEE; (2) sometió la continuidad indefinida del contrato a condiciones potestativas en beneficio exclusivo de LUMA Energy; (3) no fue aprobada según lo requerido estatutariamente; (4) no contó con el voto afirmativo de los dos directores del interés público, tal como exige la Sección 10(b) de la Ley Núm. 120-2018, *infra*, ni con el voto del Director Ejecutivo de la AEE; y (5) no recibió la aprobación ni el *Certificado de cumplimiento de energía* del Negociado de Energía de Puerto Rico (NEPR). Por consiguiente, argumentaron que procedía poner en vigor la cláusula resolutoria automática del acuerdo suplementario, decretar la terminación de este último y del contrato principal, así como proveer para una transición ordenada en la operación del sistema eléctrico de Puerto Rico, de conformidad con las obligaciones asumidas por LUMA Energy. A los fines de asegurar dicha transición, la AAPP y la AEE también solicitaron la concesión de remedios provisionales e interdictales, al amparo de la obligación de LUMA Energy pautada en el Artículo 16 del contrato principal.

Por otra parte, la Gobernadora y el Gobierno de Puerto Rico, al invocar sus poderes de razón de Estado y

su interés de *parens patriae,* presentaron esencialmente los mismos planteamientos. Por eso, reclamaron que se declare tal nulidad y que, en virtud de la cláusula de terminación automática del propio acuerdo suplementario, se decrete resuelta la relación contractual entre las partes y se activen las disposiciones del contrato principal que les obligan a garantizar una transición ordenada en la operación del sistema eléctrico.

Tanto la AAPP y la AEE como la Gobernadora y el Gobierno de Puerto Rico, mediante recursos separados, solicitaron ante nos la certificación intrajurisdiccional de ambos casos. A su juicio, el escenario actual presenta una oportunidad idónea para resolver, de forma final, una materia urgente, novedosa y de alto interés público que incide directamente sobre la totalidad del pueblo puertorriqueño. En ese sentido, esbozaron que la etapa de los procedimientos favorece la certificación solicitada. Primero, porque el planteamiento de nulidad no requiere presentar prueba y tampoco existen hechos materiales en conflicto. Segundo, porque el caso trata de aspectos puntuales y exclusivos de derecho relacionados con la nulidad de un contrato gubernamental.

En contraposición, LUMA Energy rechazó que la carta del 30 de noviembre de 2022 fuera nula. Respecto a los planteamientos sobre nulidad, ripostó que: (1) como la carta no era una transacción de la AEE, según definida en

la *Ley para Transformar el Sistema Eléctrico de Puerto Rico*, Ley Núm. 120-2018, según enmendada, 22 LPRA sec. 1114 *et seq.*, no era requerido el voto afirmativo de los dos representantes del interés público de la Junta de Directores de la AAPP; (2) no existía un requisito legal de que el Director Ejecutivo de la AEE aprobara la carta porque la autoridad recaía en la Junta de Gobierno de esa entidad; (3) no era necesario un nuevo *Certificado de cumplimiento de energía* del NEPR; (4) la carta no añadió términos nuevos a los pactados en el contrato principal ni en el suplementario; (5) la carta no autorizaba a LUMA Energy a operar el sistema eléctrico por un periodo indefinido o que supere el término máximo de 50 años de duración de un contrato de alianza público-privada, sino hasta que la AEE culmine su proceso de reestructuración de deudas.

Incluso, LUMA Energy fue más allá y, por medio de una reconvención, promovió múltiples causas de acción en contra del Gobierno. Entre estas figuran: el cumplimiento específico de los acuerdos suscritos entre las partes; el dolo en la formación y ejecución del contrato; la culpa *in contrahendo*; la mala fe contractual; el enriquecimiento sin causa; y una sentencia declaratoria sobre abuso del poder ejecutivo y mal uso de fondos públicos. En síntesis, argumentó que el Gobierno: (1) debía cumplir con el procedimiento de resolución de disputas del acuerdo

principal; (2) de determinarse que la carta que extendió el contrato suplementario es nula, debía responder a LUMA Energy por dolo y culpa al haberle representado, durante las negociaciones, que la carta sería aprobada válidamente por los funcionarios con autoridad para suscribirla; (3) incurrió en dolo al realizar acciones que validaron la legalidad de la extensión del acuerdo suplementario; (4) actuó de mala fe al mentir y engañar a LUMA Energy al suscribir la carta o, en la alternativa, al inducir a error al Tribunal en cuanto a que la carta es nula; y (5) se enriqueció injustamente de las inversiones que realizó LUMA Energy durante los años que ha estado vigente la relación contractual en virtud de la extensión del acuerdo suplementario.

Indistintamente de la validez de los planteamientos de LUMA Energy, de entrada, la posible nulidad del contrato de transmisión es una cuestión de umbral, revestida de un altísimo interés público, con un enorme potencial de disponer de la totalidad del pleito. **Exactamente para eso disponemos del mecanismo procesal de la certificación intrajurisdiccional.**

Sabido es que, mediante la certificación intrajurisdiccional, el Tribunal Supremo discrecionalmente puede elevar inmediatamente ante su consideración cualquier asunto pendiente ante los foros inferiores cuando se plantee: (1) la existencia de un

conflicto entre decisiones previas del Tribunal de Apelaciones; (2) **una cuestión novel de derecho**; o (3) **una controversia de alto interés público** que incluya un asunto constitucional sustancial al amparo de la Constitución de Puerto Rico o de los Estados Unidos. Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V; *Senado v. Tribunal Supremo y otros*, 208 DPR 115, 127 (2021). En el ejercicio de esa facultad excepcional, hemos discernido que corresponde evaluar: (1) la urgencia del asunto, (2) la etapa en que se encuentran los procedimientos, (3) la necesidad de recibir prueba y (4) la complejidad de la controversia. *Senado v. Tribunal Supremo y otros*, *supra*, pág. 128.

En el pasado, he favorecido la expedición de recursos de certificación intrajurisdiccional cuando se trata de casos de alto interés público que ameritan la intervención oportuna y eficaz de este Tribunal. En esta ocasión, no es para menos, pues la presente disputa involucra un tema tan preciado como el servicio esencial de energía eléctrica a los hogares, centros de salud, instituciones educativas y comercios de todo Puerto Rico. Igualmente, exige que interpretemos, bajo las particularidades de esta controversia, el alcance y los parámetros de la contratación gubernamental de conformidad con la Ley Núm. 120-2018, *supra*, y la *Ley de alianzas público privadas*, Ley Núm. 29-2009, según enmendada, 27 LPRA sec. 2601 *et*

*seq.* En vista de lo anterior, este es el momento oportuno para certificar y atender una polémica novel de altísimo interés público que requiere una adjudicación pronta, final y firme para beneficio de todos y todas en Puerto Rico.

Ello, ante la realidad de que estamos ante una controversia de estricto derecho que, por lo tanto, no requiere descubrimiento de prueba. Al contrario, en esta etapa, lo aplicable es realizar un análisis estatutario dirigido a evaluar puntualmente si se cumplieron las exigencias de la ley al momento de pactarse la extensión del vínculo contractual habido entre las partes. De concluirse que tales exigencias no fueron satisfechas, procedería otorgar el remedio solicitado y huelga atender los planteamientos contenidos en la reconvención, o, como mucho, procedería atenderlos bajo el crisol del derecho aplicable a las normas de contratación gubernamental.

Es decir, de prevalecer la postura del Gobierno y declararse nula la extensión del acuerdo suplementario entre las partes, el caso culminaría, lo que requeriría impartir instrucciones ulteriores para la transición ordenada del manejo del sistema de transmisión y distribución de energía eléctrica. Por otro lado, de rechazarse la nulidad, procedería la devolución del caso al foro primario para la atención de cualquier trámite

pendiente, incluida la adjudicación de las reclamaciones contractuales de LUMA Energy.

Aun si para fines argumentativos adoptáramos la postura de LUMA Energy en contra de la certificación, tres de las causas de acción en su reconvención se sustentan bajo la premisa de una declaración de nulidad. Por tanto, a esa parte también le resulta procesalmente adecuado que este Tribunal paute el derecho aplicable previo a que comience un tedioso y prolongado descubrimiento de prueba. En otras palabras, como cuestión de realidad, LUMA Energy plantea tres causas de acción basadas en la legalidad de la contratación y tres sustentadas en la presunta ilegalidad. Es un contrasentido esperar a que concluyan los procedimientos para que, con alta probabilidad, los foros apelativos revisen y, al final del camino, pudiesen determinar que el foro primario actuó bajo un supuesto jurídico errado. ¿Por qué no despejar el camino pautando el derecho aplicable en una controversia de alto interés público que, en esta etapa, no requiere descubrimiento de prueba?

De ahí que comparto el planteamiento de la Gobernadora y el Gobierno en su *Moción en cumplimiento de orden* en el recurso CT-2025-007 respecto a que "[e]n uno u otro sentido, la validez de la Carta-Extensión es la cuestión de derecho que decide la totalidad de los asuntos y que antecede todas las controversias que propone LUMA

con su reconvención, por lo que certificar precisamente esa controversia, lejos de fragmentar el caso, ordena su prelación lógica y resuelve el umbral del que penden todos los reclamos".

En ese sentido, no puedo avalar la teoría de que este foro de última instancia no puede certificar la totalidad del recurso y resolver esa cuestión de umbral para luego, si fuere necesario, devolver el caso al foro primario para acciones ulteriores consecuentes con lo pautado. Así lo hemos hecho en múltiples casos en los que este Tribunal ha atendido cuestiones de umbral, tales como la falta de jurisdicción o la nulidad, y hemos procedido a pautar el derecho, disponer del asunto o devolver al foro primario con instrucciones cónsonas con lo resuelto. Así lo hemos realizado, incluso, en recursos de certificación intrajurisdiccional. Como puede apreciarse no se trata de una fragmentación de los casos o de las causas de acción, sino de traer la totalidad de los recursos, certificarlos y disponer primariamente de la controversia de alto interés público presentada ante nuestra atención.

Ante esa realidad, valga resaltar la importancia de que la determinación provenga del más alto foro, pues de esa manera se le imprimiría confianza y finalidad al eventual dictamen judicial sobre la nulidad. Esta certeza es todavía más crítica ante la solicitud –y posible necesidad– de emitir remedios interdictales que permitan

una transición ordenada en la transmisión de energía eléctrica. Al certificar los recursos de epígrafe, este Tribunal actúa con la debida celeridad para fomentar la estabilidad jurídica en torno a la provisión de tan esencial servicio.

En contraste, la prolongación del pleito a la espera de la culminación de un descubrimiento de prueba y un litigio de gran envergadura -sin atender esta cuestión de estricto derecho- no redundaría en economía procesal. Al contrario, ese curso de acción, sumado a la multiplicidad de posibles trámites apelativos, expone innecesariamente, a las partes y al Pueblo, a una incertidumbre jurídica. A fin de cuentas, nuestra responsabilidad constitucional de impartir justicia a través de la atención oportuna de los casos de interés público es parte integral del debido proceso de ley. *Alvarado Pacheco y otros v. ELA*, *supra*, pág. 657 (Voto particular del Juez Asociado señor Estrella Martínez). Ello responde primordialmente a la expectativa de la ciudadanía de que este Tribunal emita decisiones finales y firmes que salvaguarden remedios justos y adecuados, especialmente cuando el trámite judicial ordinario pone en riesgo la concesión de estos. Íd.

Con todo esto en mente, estoy conforme con certificar los pleitos y elevar ante nuestra consideración inmediata la disputa sobre la nulidad de la relación contractual entre el Gobierno de Puerto Rico y LUMA Energy. Como ese

ese es el curso de acción adoptado por una mayoría de este Tribunal, imparto mi conformidad.


                                        Luis F. Estrella Martínez
                                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Peticionarias<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridas<br>_____<br><br>Hon. Jenniffer González Colón, Gobernadora de Puerto Rico; Gobierno de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridas<br><br>Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Recurridas | CT-2025-0006<br><br>cons. con<br><br>CT-2025-0007 |

Voto particular de conformidad emitido por la Jueza Asociada Rivera Pérez, al cual se unen el Juez Asociado señor Feliberti Cintrón, el Juez Asociado señor Estrella Martínez y el Juez Asociado señor Candelario López.

En San Juan, Puerto Rico a 5 de agosto de 2026.

En el día hoy, hemos determinado expedir y consolidar los recursos de certificación intrajurisdiccional solicitados por las Alianzas Público-Privadas de Puerto

Rico, la Autoridad de Energía Eléctrica de Puerto Rico, y la Gobernadora de Puerto Rico, Hon. Jenniffer González Colón, respectivamente. Sin lugar a duda, el futuro del sistema de transmisión y distribución de energía eléctrica para los constituyentes puertorriqueños es un asunto de alto interés público que amerita nuestra pronta intervención.

Los recursos presentados, junto con las mociones en cumplimiento de resolución y sus respectivas réplicas, evidencian la urgencia de traer de forma inmediata ante nuestra atención la controversia. Esta versa sobre la nulidad de la *carta-extensión* bajo la cual LUMA Energy, LLC y LUMA Energy ServCo, LLC operan el sistema de transmisión y distribución de energía eléctrica en Puerto Rico, lo cual es, sin duda, un asunto del más alto interés público, cuya repercusión recae sobre uno de los servicios esenciales para la ciudadanía y de trascendencia inigualable. Por ello, estoy conforme con su expedición.

**I**

En Puerto Rico, la privatización de las operaciones de la Autoridad de Energía Eléctrica (AEE) se rige por varios estatutos, entre estos, la Ley Núm. 29-2009, según enmendada, Ley de Alianzas Público-Privadas, 27 LPRA sec. 2601 et seq., y la Ley Núm. 120-2018, según enmendada, Ley para Transformar el Sistema Eléctrico de Puerto Rico, 22 LPRA sec. 1111 et seq. Así las cosas, y al amparo de este

marco legislativo, el 22 de junio de 2020, las Alianzas Público-Privadas de Puerto Rico (P3), como administradora, la AEE, en calidad de dueña, y LUMA Energy, LLC, empresa operadora, otorgaron el contrato intitulado *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (OMA). Este contrato requiere, según alegado, que la AEE culmine el procedimiento de quiebra para entonces ceder completamente el control a LUMA Energy, LLC. Como es harto conocido, el proceso de quiebra de la AEE bajo el Título III del *Puerto Rico Oversight, Management, Economic Stability Act*, 48 USC sec. 2101 et seq., no ha culminado.

Las Alianzas Público-Privadas de Puerto Rico, la AEE, así como la Hon. Jenniffer González Colón, Gobernadora de Puerto Rico, instaron, respectivamente, los recursos de certificación intrajuridiccional CT-2025-0006 y CT-2025-0007. En estos, nos solicitan una interpretación sobre la validez o nulidad de la *carta-extensión* bajo la cual LUMA Energy, LLC, y LUMA Energy ServCo, LLC (en conjunto LUMA), actualmente operan el sistema de transmisión y distribución de energía eléctrica en Puerto Rico, asunto que es estrictamente de derecho. Ello a los fines de poder determinar si este acuerdo enmendó válidamente el *Puerto Rico Transmission and Distribution System Supplemental Terms Agreement*. En síntesis, en ambos recursos se alegó que la *carta-extensión* es contraria al interés público por

cuanto: a) fue aprobada sin "contar con el voto afirmativo de ambos representantes del interés público" según dispuesto en la Ley 120-2018, *supra*, sec. 10 (b); b) no contiene una fecha cierta de terminación; c) su terminación depende exclusivamente de LUMA; d) no cuenta con métricas de calidad para evaluar su cumplimiento; y e) conlleva el desembolso de más del doble de lo acordado originalmente en la tarifa del servicio (*service fee*), entre otros asuntos.

Por otro lado, LUMA instó una reconvención en el Tribunal de Primera Instancia, en la cual promovió múltiples causas de acción en contra de la P3, la AEE y el Gobierno de Puerto Rico. En apretada síntesis, argumentó que, de declararse nula la *carta-extensión,* el Gobierno de Puerto Rico y demás partes contratantes le responderían bajo los principios generales aplicables a los contratos, a saber, mala fe, dolo, error y las doctrinas como "actos propios" e "enriquecimiento injusto". Basado en estas alegaciones, LUMA señaló que era necesario realizar un exhaustivo descubrimiento de prueba, lo cual, a su entender, impiden conceder la expedición de los autos de Certificación Intrajurisdiccional, debido a que las controversias no requerirían únicamente un análisis de derecho. Adelanto que no le asiste la razón. Por el contrario, nuestra intervención se justifica porque se trata de un asunto de alto interés público, que conlleva

considerar si las reclamaciones formuladas en la reconvención son acordes con el derecho aplicable a las contrataciones gubernamentales o si, por el contrario, requieren un análisis novel por este Alto foro.

## II

La Ley Núm. 201-2003, según enmendada, conocida como la Ley de la Judicatura del 2003, 4 LPRA secs. 24 et seq., dispone los dos supuestos en los cuales, como parte de su competencia, este Tribunal puede atender asuntos mediante el auto de certificación. Estos se diferencian en su procedencia. Se denominan "certificaciones intrajurisdiccionales" cuando los autos proceden del Tribunal de Primera Instancia o del Tribunal de Apelaciones, y se designan "certificaciones interjurisdiccionales" cuando el asunto procede de alguno de los tribunales del sistema federal.

En los presentes casos, nos encontramos ante un auto de certificación intrajurisdiccional que proviene del Tribunal de Primera Instancia, Sala de San Juan. En cuanto a este tipo de certificación, el Art. 3.002 (f) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, *supra*, 4 LPRA sec. 24s (f), dispone que este Tribunal, "[m]ediante auto de certificación, a ser expedido discrecionalmente, motu proprio, o a solicitud de parte, podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto pendiente ante el Tribunal de

Primera Instancia cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, **se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público** que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución de Puerto Rico o de la Constitución de Estados Unidos". (Negrilla suplida), 4 LPRA sec. 24s (f). Además, la presentación de una solicitud de certificación intrajurisdiccional no interrumpe los procedimientos ante el tribunal en que se encuentre el caso a ser certificado, pero este no podrá dictar sentencia, a menos que se deniegue su expedición. Por otro lado, de expedirse el auto de certificación, el caso pasará entonces en su totalidad a nuestra atención. Véase Regla 23 (b)(2) del Reglamento del Tribunal Supremo de Puerto Rico, 4 LPRA Ap. XXI-B. En consecuencia, el asunto será traído ante la jurisdicción de este Tribunal y el foro primario estará impedido de llevar a cabo cualquier adjudicación.

Por otro lado, en varias instancias, esta Curia ha reiterado que el auto de certificación intrajurisdiccional es un mecanismo extraordinario y de carácter discrecional que nos permite traer de inmediato ante nuestra consideración cualquier asunto pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones cuya controversia sea una del más alto interés público y que exige la más pronta atención. Véanse, *Com. Elect PPD v. CEE*

*et al.*, 205 DPR 724, 739 (2020); *Moreno v. Pres. U.P.R. II*, 178 DPR 969, 972 (2010); *Domínguez Castro et al. v. E.L.A. I*, 178 DPR 1 (2010); *San Gerónimo Caribe Project v. E.L.A. I*, 174 DPR 518 (2008) (allí acogimos la solicitud de certificación **conscientes de la necesidad de una pronta solución** al caso); *Romero Barceló v. E.L.A.*, 169 DPR 460 (2006)(avalamos la solicitud de certificación por entender que **la controversia sobre la tasa contributiva** impuesta en la Ley Núm. 117-2006 era de alto interés público); *Rivera v. J.C.A.*, 164 DPR 1, 7 (2005).

En suma, el auto de certificación intrajurisdiccional procede ante asuntos donde se planteen cuestiones noveles de derecho y/o cuestiones de alto interés público. Una vez identificadas, en el ejercicio de nuestra discreción, podemos traer de inmediato ante nuestra consideración cualquier asunto pendiente ante el Tribunal de Primera Instancia.

**III**

Como señalé, en los recursos de certificación intrajurisdicional presentados ante esta Curia nos solicitan una interpretación de la validez de la *carta-extensión* bajo la cual LUMA actualmente opera el sistema de transmisión y distribución de energía eléctrica en Puerto Rico. De acuerdo con las alegaciones, en la *carta-extensión* se le concedió unilateralmente a LUMA el derecho de terminar con los acuerdos allí dispuestos sin poder

considerar o evaluar su desempeño, lo cual, según aseguran, es contrario al interés público. Por ende, la controversia amerita nuestra pronta atención y, como garante del interés público sobre contrataciones gubernamentales de servicios esenciales, estoy conforme con su expedición.

De otra parte, el resolver de manera definitiva la validez o nulidad de la *carta-extensión* contribuye a nuestro deber de velar por el cumplimiento con las disposiciones legales dirigidas a proteger el desembolso de fondos públicos, en resguardo del interés público y no del de las partes contratantes. Véanse, *Quest Diagnostic v. Mun. San Juan*, 175 DPR 994, 1002 (2009); *Hatton v. Mun. de Ponce*, 134 DPR 1001, 1011 (1994). Asimismo, es harto conocido que los estatutos especiales "que rigen las relaciones económicas entre entidades privadas y agencias gubernamentales están revestidos de un **gran interés público y aspiran promover una sana y recta administración pública**". (Negrilla suplida). Véase *A.E.E. v. Maxon*, 163 DPR 434, 438-439 (2004). **Por tanto, ante la importancia de estos contratos, y ante la crisis de energía que enfrentamos hoy, no hay duda de que la controversia ante esta Curia amerita nuestra pronta intervención.** "El concepto 'fin público' no es estático, sino que está ligado al bienestar general y que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica, a los problemas peculiares que éstas crean y a

las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja". Véase *PPD v. Gobernador I*, 139 DPR 643, 686 (1995). Véase, además, *Dalmau Ramírez et al v. ELA et al.*, 214 DPR 841, 957 (2024). Asimismo, del preámbulo de nuestra Constitución surge claramente como objetivo de la organización política y social de nuestro país, **la promoción del bienestar general de la ciudadanía.** Preámbulo, Const. P.R., LPRA, Tomo 1. **Así las cosas, debemos evaluar si la *carta-extensión* bajo la cual LUMA actualmente opera el sistema de transmisión y distribución de energía eléctrica es válida y si perjudica el interés público.**

De otra parte, ordinariamente tratamos asuntos que son devueltos ante el Tribunal de Apelaciones o al Tribunal de Primera Instancia para la continuación de los procedimientos acorde con lo resuelto. Por lo tanto, distinto a lo alegado por LUMA, entiendo que los procedimientos ante el Tribunal de Primera Instancia no se verán afectados por la expedición del auto de certificación ni es necesario atender el pleito en su totalidad para poder ejercer nuestra discreción a favor de su expedición. El hecho de que el pleito sea traído en su totalidad ante nuestra consideración **no puede ser interpretado bajo la premisa que corresponde a esta Curia disponer de todas las controversias o asuntos que se planteen en el mismo, concluir lo contrario sería un fracaso a la sana**

**administración de la justicia.** Asimismo, considero que dicha interpretación constituiría una "camisa de fuerza" no dispuesta en nuestro ordenamiento. La interpretación de la Regla 23 (b)(2) de nuestro Reglamento debe ser cónsona con los procesos apelativos. Por tanto, una vez expedidos los recursos, el foro primario estará impedido de llevar a cabo cualquier adjudicación, como consecuencia de que el pleito (en su totalidad) se encuentra bajo nuestra jurisdicción.

Además, nuestra pronta atención a la controversia sobre la nulidad o validez de la *carta-extensión* agilizaría los procedimientos ante el Tribunal de Primera Instancia y permitiría, como ya indiqué, encausar conforme a derecho las reclamaciones instadas por LUMA en su reconvención. Así, nuestra intervención promueve también uno de los objetivos primordiales de nuestro sistema judicial, que es el proveer la solución justa, rápida y económica de todo procedimiento.

Por lo anterior, coincido con la determinación de expedir los autos de certificación intrajurisdiccional presentados por la P3, la AEE y la Gobernadora de Puerto Rico, Hon. Jenniffer González Colón, respectivamente. Como es conocido, el servicio de energía eléctrica es uno esencial para el desarrollo económico del país y centro de una vida digna para nuestros ciudadanos. La actividad de transmisión y venta de energía eléctrica está afectada por

el interés público. *Jersey Central Power & Light Co. v. FPC*, 319 U.S. 61, 72-73 (1943). Véase, además, la sec. 201(a) de la Ley Federal de Energía (Federal Power Act), según enmendada, conocida por sus siglas en inglés como FPA, 16 USC sec. 824(a). Estos, sin duda, constituyen parámetros que mueven nuestra discreción y prudencia al uso de este mecanismo extraordinario que nos permite traer de inmediato el asunto ante nuestra atención. *U.P.R. v. Laborde Torres y Otros I*, 180 DPR 253, 272-273 (2010).

## IV

Por tanto, al no existir impedimento alguno por el cual esta Curia debería abstenerse de ejercer su discreción a favor de la expedición del auto de certificación intrajurisdiccional, estoy conforme con el curso de acción adoptado por la mayoría de este Tribunal.


Camille Rivera Pérez
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Peticionarias<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridos | CT-2025-0006<br><br>cons. con |
| Hon. Jenniffer González Colón, Gobernadora de Puerto Rico; Gobierno de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy Servco, LLC<br><br>Recurridos<br><br>Autoridad para las Alianzas Público Privadas; Autoridad de Energía Eléctrica<br><br>Recurridas | CT-2025-0007 |

Voto Particular Disidente emitido por el Juez Asociado señor COLÓN PÉREZ al que se unen la Jueza Presidenta ORONOZ RODRÍGUEZ, el Juez Asociado señor MARTÍNEZ TORRES y el Juez Asociado señor KOLTHOFF CARABALLO.

En San Juan, Puerto Rico, a 5 de agosto de 2026.

En esta ocasión, estábamos llamadas y llamados a determinar si, en esta etapa de los procedimientos, procedía, o no, acoger ciertos recursos de certificación intrajurisdiccional presentados en las causas de epígrafe. Mediante éstos, la Autoridad para las Alianzas Público Privadas y la Autoridad de Energía Eléctrica (en adelante y

en conjunto, "P3"), de un lado; y la Gobernadora de Puerto Rico, Hon. Jenniffer González Colón, junto con el Gobierno de Puerto Rico (en adelante y en conjunto, "Gobierno de Puerto Rico"), del otro, nos pidieron traer, inmediatamente ante nos, determinados litigios que éstos incoaron, por separado, ante el Tribunal de Primera Instancia.

A su vez, mediante los referidos pleitos, dichas partes solicitaron, entre otros remedios, la declaración de nulidad de la extensión del acuerdo mediante el cual las entidades allí demandadas, -- a saber, LUMA Energy, LLC y LUMA Energy Servco, LLC (en adelante y en conjunto, "LUMA") --, actualmente operan y administran el sistema de transmisión y distribución de energía eléctrica de Puerto Rico. Petición que, a contraparte, y mediante el mecanismo procesal de la reconvención compulsoria, trajo ante la consideración del foro primario planteamientos de LUMA, los cuales surgen del mismo evento que motiva la reclamación de la parte adversa, que incluyen alegaciones de dolo, fraude, incumplimiento deliberado y de mala fe de obligaciones contractuales, *culpa in contrahendo*, abuso de poder, entre otras.

**Así pues, dada la naturaleza de las controversias ante nuestra consideración, no podemos estar de acuerdo con la determinación que hoy emite una mayoría de este Tribunal, de dar paso, -- en esta etapa tan temprana de los litigios que las motivan y sin contar con la prueba requerida para su adecuada adjudicación --, a las peticiones de certificación intrajurisdiccional que aquí se nos hacen. Y es que la**

**actuación de una mayoría de mis compañeras y compañeros de estrado, a todas luces, desnaturaliza la forma justa, correcta y adecuada de conducir procesos judiciales como los que hoy nos ocupan, según ha sido históricamente contemplado por nuestro ordenamiento procesal civil.**

**Esperamos, pues, que no sea el Pueblo de Puerto Rico quien, al final del día, pague las consecuencias de la prisa de este Tribunal en remover del trámite ordinario un litigio técnico, complejo y multidimensional. Nos explicamos.**

I.

Allá para el 22 de junio de 2020, P3, en carácter de administradora; la Autoridad de Energía Eléctrica, en calidad de dueña; y LUMA, como empresa operadora, suscribieron un acuerdo intitulado *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (en adelante, "contrato principal"). Dicho acuerdo contempló ceder a LUMA, -- de manera final o definitiva --, la administración, operación y mantenimiento del sistema de transmisión y distribución de energía eléctrica de Puerto Rico, una vez se cumpliesen una serie de requisitos, denominados, en el mencionado documento, como "service commencement date conditions". Al respecto, una de las condiciones más importantes para cederle el control total a LUMA radicó en que la Autoridad de Energía Eléctrica culminase su proceso de quiebra bajo el Título III de la ley federal Puerto Rico Oversight, Management, Economic Stability Act (en adelante, "PROMESA"), 48 USC sec. 2101 *et seq.*

En atención a que la antedicha corporación pública todavía se encontraba en el referido proceso federal de bancarrota, las partes allí contratantes estimaron conveniente formalizar un convenio para regir sus relaciones jurídicas hasta tanto se pudiese poner en vigor el contrato principal. Cónsono con ello, ese mismo día, -- entiéndase, el 22 de junio de 2020 --, éstas también suscribieron un contrato al que titularon *Puerto Rico Transmission and Distribution System Supplemental Terms Agreement* (en adelante, "contrato suplementario"). En éste, establecieron, entre otros acuerdos, salvaguardas temporales para proteger el interés público hasta tanto el contrato principal entrase en vigor. Sin embargo, conforme a su naturaleza provisional, dicho contrato suplementario vislumbró: (1) un término máximo de vigencia de dieciocho (18) meses, -- el cual comenzaría el 1 de junio de 2021 --; (2) así como una cláusula resolutoria, mediante la cual se resolverían automáticamente, tanto el contrato principal como el suplementario, en la eventualidad de que el mencionado periodo de vigencia culminase sin que haya entrado en vigor el contrato principal, salvo que las partes acordasen extenderlo, con arreglo a derecho, antes de su vencimiento.

Ahora bien, el último día del antedicho periodo de vigencia, -- a saber, el 30 de noviembre de 2022 --, las partes contratantes suscribieron una carta (en adelante, "carta de extensión"), mediante la cual pretendieron enmendar los términos de vigencia del contrato suplementario.

Particularmente, el antedicho documento eliminó la cláusula resolutoria de los dieciocho (18) meses y, en su lugar, extendió la duración de la relación contractual hasta que se cumpliesen dos condiciones, a saber: (1) que la Autoridad de Energía Eléctrica culminase su proceso de bancarrota bajo el Título III de PROMESA, *supra*; y (2) que se aprobase un plan de ajuste de deuda que fuese razonablemente aceptable para LUMA ("reasonably acceptable to Operator").

Es, pues, en virtud de tal extensión del contrato suplementario, modificado por la carta de extensión, que LUMA ha estado operando el sistema de transmisión y distribución de energía eléctrica de Puerto Rico hasta el presente, y cuya validez motiva los asuntos que hoy nos competen.

Años después de suscrita la referida carta de extensión, -- a saber, el 11 de diciembre de 2025 --, P3 presentó, ante el Tribunal de Primera Instancia, cierta *Demanda jurada de sentencia declaratoria e injunction preliminar*. En ésta, dicha parte solicitó, esencialmente, una sentencia declaratoria de la nulidad de la mencionada carta de extensión, así como varios remedios interdictales para asegurar el intercambio de información necesaria para la continuidad de dicho servicio durante la fase de transición hacia otra empresa todavía no identificada. Esto último, por supuesto, en el caso de que se declarase la nulidad de la referida misiva que enmendó el contrato suplementario.

En síntesis, los planteamientos de nulidad que, ante el foro primario, realizó P3 se pueden dividir en dos

vertientes: (1) las teorías intrínsecas al contenido del documento, o de fondo, relativas al lenguaje que extiende la duración de la relación contractual a un término indefinido mediante una condición suspensiva puramente potestativa, entiéndase, la continuación del acuerdo hasta tanto LUMA entienda que se ha aprobado un plan de ajuste que considere razonablemente aceptable; y (2) las teorías extrínsecas al contenido del documento, o de forma, relacionadas con la inobservancia de ciertos requisitos estatutarios esenciales para perfeccionar el antedicho acuerdo. A juicio de dicha parte, cualquiera de las teorías resultaría suficiente, por sí sola, para declarar la nulidad de la carta de extensión.

En esa misma fecha, -- entiéndase, el 11 de diciembre de 2025 --, P3 compareció ante nos mediante un *Recurso de certificación intrajurisdiccional*. En éste, la referida entidad nos solicitó que trajésemos, inmediatamente ante nuestra consideración, dicho pleito, dado el alto interés público y la urgencia de las controversias planteadas.[1]

Ahora bien, el 16 de diciembre de 2025, el Gobierno de Puerto Rico incoó, ante el foro primario, otra *Demanda*. En su petitorio, dicha parte también solicitó la declaración de

_____

[1] Sin embargo, el 15 de diciembre de 2025, LUMA presentó, ante el Tribunal Federal de Distrito de Puerto Rico, una *Notificación de Traslado* (*Notice of Removal*). Mediante ésta, dicha parte removió, a la esfera federal, el caso iniciado ante el Tribunal de Primera Instancia, a tenor de ciertas disposiciones de PROMESA, *supra*, así como bajo planteamientos de diversidad de ciudadanía. Así pues, el 17 de diciembre de 2025, emitimos una *Resolución*, mediante la cual ordenamos el archivo administrativo del mencionado recurso de P3. Ello, condicionado a que cualquiera de las partes nos solicitara su reapertura, de cesar la jurisdicción federal sin que las controversias planteadas se hubiesen resuelto.

nulidad de la carta de extensión impugnada por P3. En gran medida, esta última reclamación calcó los mismos hechos y fundamentos legales esbozados en el recurso de P3 para solicitar tal nulificación contractual. La única diferencia notable entre el escrito del Gobierno de Puerto Rico y el de P3 radica en que el primero invocó, -- como fundamento de legitimación activa o autoridad legal para sostener su petición --, las facultades inherentes de la Gobernadora de Puerto Rico. Lo anterior, bajo sus poderes de razón de Estado y su interés de *parens patriae*.

Similar al recurso de certificación presentado por P3, el 16 de diciembre de 2026, el Gobierno de Puerto Rico compareció ante nos mediante un *Urgente recurso de certificación intrajurisdiccional*. En el referido escrito, dicha parte también nos solicitó traer, inmediatamente ante nuestra consideración, su correspondiente litigio subyacente instado ante el Tribunal de Primera Instancia.[2]

Así las cosas, -- y, luego de una litigación prolongada en los foros federales respecto a ambos pleitos, por haber sido éstos removidos por LUMA --,[3] el 23 de junio de 2026,

---

[2] No obstante, el mencionado pleito también fue removido a la esfera federal por LUMA, bajo argumentos similares al amparo de PROMESA, *supra*. Por lo tanto, el 18 de diciembre de 2025, también archivamos este último recurso en iguales condiciones que el anterior.

[3] En apretada síntesis, el 8 de mayo de 2026, el Tribunal Federal de Distrito para el Distrito de Puerto dictaminó que los pleitos en cuestión se debían devolver al foro estatal de origen, debido a que éstos estaban comprendidos por la excepción del poder regulatorio por razón de Estado (*police or regulatory power exception*) que dispone la Sección 306(d)(1) de PROMESA, 48 U.S.C. sec. 2166(d)(1), así como por exigencia contractual. Asimismo, el 1 de junio de 2026, dicho foro denegó cierta solicitud de paralización instada por LUMA, toda vez que entendió que

la Secretaría del Tribunal de Distrito Federal para el Distrito de Puerto Rico remitió a la Secretaría del Tribunal de Primera Instancia determinada comunicación. Mediante ésta, se informó que la jurisdicción federal había culminado, devolviendo así la autoridad a la esfera estatal de origen para continuar los procedimientos en las causas de epígrafe.

En virtud de lo anterior, ese mismo día, -- entiéndase, el 23 de junio de 2026 --, tanto P3, como el Gobierno de Puerto Rico, comparecieron ante nos, respectivamente, mediante una *Moción informativa y reiteración de recurso de certificación intrajurisdiccional* y una *Moción informativa sobre devolución del caso*. En éstas, esencialmente, dichas partes, además de informarnos sobre la culminación de la jurisdicción federal, nos solicitaron que reabriéramos sus recursos y tomásemos las providencias correspondientes.

**Sin embargo, ese mismo 23 de junio de 2026, LUMA compareció ante nos, en cada uno de los recursos de epígrafe, mediante sendos escritos intitulados *Moción informativa sobre orden de "remand" y contestación a demanda presentada ante el Tribunal de Primera Instancia*. En éstos, básicamente, dicha parte nos señaló que presentó, en ambos pleitos ante el foro primario, escritos en contestación a las demandas y, particularmente, reconvenciones compulsorias contra todas las partes aquí peticionarias.**

cierta apelación, presentada ante el Tribunal Federal de Apelaciones para el Primer Circuito, era inmeritoria y no se demostró algún daño irreparable o afectación del interés público. Así las cosas, el 19 de junio de 2026, el foro apelativo intermedio federal denegó una solicitud de paralización de LUMA, por razones similares a las del foro recurrido.

En vista de ello, dicha parte nos señaló que los asuntos incluidos en sus reclamaciones requieren la celebración de un procedimiento de descubrimiento de prueba para su adecuada dilucidación. Lo anterior, debido a que los pleitos a nivel de instancia no presentan un asunto estrictamente de derecho, sino que exigen el manejo de evidencia para formular las correspondientes determinaciones fácticas indispensables para disponer de las controversias planteadas. Por tal razón, **LUMA** nos indicó que se opondría a las certificaciones intrajurisdiccionales solicitadas.

Asimismo, junto con las referidas mociones informativas presentadas ante nos, **LUMA** acompañó copia de las mencionadas contestaciones y reconvenciones compulsorias. De una lectura de éstas, podemos colegir que **LUMA** está reclamando las siguientes causas de acción en contra de P3 y del Gobierno de Puerto Rico: (1) cumplimento específico; (2) dolo en la formación contractual; (3) *culpa in contrahendo*; (4) dolo en la ejecución del contrato; (5) mala fe contractual; (6) enriquecimiento sin causa; (7) sentencia declaratoria sobre abuso del Poder Ejecutivo; y (8) sentencia declaratoria sobre un mal uso de fondos públicos para adelantar campañas y candidaturas políticas.

Ante todos esos planteamientos, -- los cuales comprenden alegaciones de fraude, dolo, intención e incumplimiento deliberado --, **LUMA** solicitó al foro primario autorizar un descubrimiento de prueba extenso, que incluya la toma de deposiciones de todas las personas involucradas en el proceso

**de aprobación de la carta de extensión o en la decisión de impugnar judicialmente su validez.**

De otro lado, el 23 de junio de 2026, LUMA presentó, ante nos, una *Solicitud de consolidación*.[4] A contraparte, el 25 de junio de 2026, el Gobierno de Puerto Rico replicó la mencionada petición mediante una *Oposición a solicitud de consolidación de LUMA*.[5] Igualmente, ese mismo 23 de junio de 2026, P3 presentó, ante nos, una *Oposición a "Solicitud de consolidación"*.[6] Asimismo, y en respuesta a ello, el 26 de junio de 2026, LUMA compareció ante nos, en ambos recursos de epígrafe, mediante escritos intitulados *Réplica a oposición a solicitud de consolidación*.[7]

---

[4] En ésta, LUMA adujo que ambas solicitudes de certificación intrajurisdiccional presentadas ante este Tribunal, así como las demandas que las motivan, versan sobre los mismos hechos, las mismas reclamaciones, el mismo derecho, la misma parte recurrida y se encuentran en la misma etapa procesal, de modo que se satisfacen todos los requisitos para consolidarse. Asimismo, dicha parte expuso que tal unificación resultaría en un beneficio procesal, toda vez que se economizaría tiempo y dinero, así como promovería determinaciones consistentes.

[5] En ésta, el Gobierno de Puerto Rico objetó la referida solicitud, bajo el fundamento de que su petitorio se ampara en los poderes inherentes de la Gobernadora de Puerto Rico, así como en su poder de razón de Estado y su interés de *parens patriae*. A su juicio, tales facultades u objetivos constituyen fundamentos independientes que impiden consolidarlo con el recurso presentado por P3.

[6] Mediante el referido escrito, P3 se unió a los argumentos esbozados por el Gobierno de Puerto Rico, particularmente, respecto a que su legitimación activa surge como dueña del sistema eléctrico y parte contratante, mientras que la de la Gobernadora de Puerto Rico emana al palio de las facultades inherentes a su cargo; y que la solicitud responde a una estrategia dilatoria.

[7] En esencia, LUMA sostuvo que la oposición de P3 y del Gobierno de Puerto Rico a la consolidación peticionada resulta totalmente inmeritoria, toda vez que: (1) estas últimas no refutan que los dos pleitos incluyen alegaciones de hechos y de derecho idénticas en contra de un mismo demandado, para solicitar el mismo remedio principal de la declaración de nulidad de la carta de extensión, de modo que "son espejos uno del otro"; y (2) que las diferencias en las bases legales de legitimación activa de los demandantes, -- entiéndase, la de P3 como parte contratante y la del Gobierno de Puerto Rico como parte investida de poderes de razón de Estado con un interés *parens patriae* --, no constituye un criterio ni un obstáculo para darle paso, o no, a una consolidación.

Así las cosas, -- en atención a los planteamientos de LUMA en torno a los desarrollos procesales ante el Tribunal de Primera Instancia --, el 29 de junio de 2026, emitimos sendas resoluciones en cada uno de los casos de autos. Mediante éstas, concedimos a P3 y al Gobierno de Puerto Rico un término de quince (15) días para que se expresaran sobre la procedencia de las certificaciones intrajurisdiccionales que aquí nos peticionan, en vista de la presentación, ante el foro primario, de las reconvenciones compulsorias instadas por LUMA en los respectivos litigios que motivan los asuntos ante nuestra consideración. De igual modo, dejamos en suspenso la solicitud de consolidación de LUMA hasta tanto fuésemos a determinar acoger, o no, los recursos de epígrafe.

Pues bien, ese mismo 29 de junio de 2026, LUMA presentó ante nos, en cada recurso, sendos escritos intitulados *Oposición a recurso de certificación intrajurisdiccional*. En esencia, mediante éstos, dicha parte nos solicita que deneguemos los recursos de certificación intrajurisdiccional de epígrafe, de modo que los litigios que los motivan continúen su curso ordinario ante el foro primario. Ello, especialmente, ante la presentación de las reconvenciones compulsorias a las que hicimos referencia, las cuales LUMA entiende que impiden traer los mencionados pleitos inmediatamente ante nuestra consideración. Lo anterior así, por ser necesario un procedimiento de descubrimiento de prueba y las correspondientes determinaciones de hecho en

vista de las alegaciones de dolo, fraude, engaño, intención e incumplimiento deliberado de las que dependen sus reclamos.

Particularmente, LUMA sostiene que la petición de P3 y del Gobierno de Puerto Rico responde a un afán apresurado de que, -- en plena temporada de huracanes --, se decrete la nulidad de la carta de extensión mediante la cual actualmente opera todo el sistema de transmisión y distribución de energía eléctrica de Puerto Rico, sin que tan siquiera exista un plan de transición o se haya identificado todavía a otro operador. A juicio de la referida empresa, acceder a la pretensión de las partes aquí peticionarias tendría el efecto de producir un caos, pondría en entredicho la credibilidad contractual de las entidades públicas puertorriqueñas y entorpecería los proyectos de reconstrucción y mejoras capitales en curso. Por tanto, dicha parte nos pide que permitamos que los pleitos de autos se continúen desarrollando ante el Tribunal de Primera Instancia.

**Lo anterior, según LUMA, responde a que, -- como foro de última instancia que no recibe prueba --, este Tribunal no es el apropiado para adjudicar las controversias planteadas y, a su vez, diseñar y supervisar la transición del manejo de ese sistema, sin tener un récord evidenciario desarrollado ante el foro primario.**

Posteriormente, -- y en cumplimiento del término concedido --, el 14 de julio de 2026, el Gobierno de Puerto Rico compareció ante nos mediante una *Moción en cumplimiento de resolución*. Ese mismo día, así también lo hizo P3, a

través de una *Moción en cumplimiento con "Resolución" sobre la procedencia del recurso intrajurisdiccional*. En extrema síntesis, P3 y el Gobierno de Puerto Rico argumentan, en sus respectivos escritos, que las reconvenciones compulsorias presentadas por LUMA ante el Tribunal de Primera Instancia no impiden certificar, de manera intrajurisdiccional, sus litigios. Ello, bajo dos fundamentos principales.

En primer lugar, dichas partes aducen que la primera causa de acción incluida en la referida alegación de LUMA, relativa a los mecanismos de resolución de disputas contenidos en el contrato principal, resulta improcedente, toda vez que la obligación contractual de agotar los mismos es nula por ser contraria a la ley y al orden público, así como por la renuncia manifiesta a ellos por las reconvenciones presentadas por LUMA ante el foro judicial.

En segundo lugar, P3 y el Gobierno de Puerto Rico plantean que el resto de las causas de acción reclamadas por LUMA, de algún modo u otro, dependen de que se resuelva la controversia jurídica principal sobre la validez de la carta de extensión, por lo que las mismas son prematuras, inexistentes o contingentes.[8] De este modo, dichas partes

_____

[8] Además, en lo que respecta a su recurso, P3 nos indica que, el 13 de julio de 2026, presentó, ante el Tribunal de Primera Instancia, una *Moción de desestimación de reconvención* al amparo de la Regla 10.2 (5) de Procedimiento Civil, *infra*. Mediante ésta, dicha parte solicita la desestimación de todas las causas de acción incluidas por LUMA en su reconvención compulsoria, toda vez que entiende que "parten de bases jurídicas dudosas, carecen de fundamento[s] o alegaciones fácticas que las apoyen y resultan inauditas". Por su parte, el Gobierno de Puerto Rico señala, en su comparecencia, que se reserva el derecho de también presentar una moción de desestimación de la reconvención instada por LUMA en su correspondiente litigio.

aducen que los planteamientos de LUMA sobre intención, confianza, representaciones o maquinaciones insidiosas y perjuicios se podrán atender posteriormente.

**En otras palabras, P3 y el Gobierno de Puerto Rico nos proponen fragmentar los litigios aquí en cuestión, de manera tal que atendamos únicamente la disputa jurídica sobre la nulidad de la mencionada misiva.** Así, nos sugieren dejarle, al Tribunal de Primera Instancia, el resto de las causas de acción y demás remedios solicitados por cada una de las partes, incluyendo el diseño de un mecanismo de transición hacia otra empresa no identificada, ante la eventualidad de que se concluya que la misma es nula.

**A esos planteamientos de P3 y del Gobierno de Puerto Rico, el 23 de julio de 2026, LUMA replicó, en cada recurso de epígrafe, mediante sendos escritos intitulados *Oposición a "Moción en cumplimiento de Resolución"*. En éstos, dicha empresa, esencialmente, reiteró sus argumentos de que, tanto las defensas afirmativas respecto a la controversia de la nulidad, como las causas de acción que incluyó en sus reconvenciones compulsorias, requieren de un descubrimiento de prueba y de determinaciones de hechos, propios del foro primario. Además, LUMA puntualizó que varias de sus reclamaciones subsistirían indistintamente del resultado en la disputa sobre la validez de la carta de extensión.**

Siendo ello así, una mayoría de este Foro, lamentablemente, hoy les da paso a las certificaciones intrajurisdiccionales de autos, en una etapa sumamente

temprana de los procedimientos y sin contar con la prueba necesaria para adjudicar los elementos fácticos de los que éstas dependen. De tal proceder, disentimos.

II.

A.

Como es sabido, este Tribunal tiene amplia discreción para expedir certificaciones intrajurisdiccionales, ya sea *motu proprio* o cuando una parte con interés así lo solicite. Artículo 3.002 de la Ley Núm. 201 de 22 de agosto de 2003, conocida como Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, 4 LPRA secs. 24 *et seq.*; Regla 52.2 (d) de Procedimiento Civil, 32 LPRA Ap. V; Regla 23 (a) del Reglamento del Tribunal Supremo de Puerto Rico, 4 LPRA Ap. XXI-B. En este tipo de recurso, este Alto Foro podrá traer inmediatamente ante sí, para considerar y resolver, cualquier asunto pendiente ante el Tribunal de Primera Instancia, cuando se plantee: (1) la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones; (2) cuestiones noveles de derecho; o (3) cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o de la Constitución de los Estados Unidos de América. *Íd.*

**De expedirse el auto de certificación intrajurisdiccional, "el caso pasará <u>en su totalidad</u> a la atención" de este Tribunal.** (Énfasis suplido). Regla 23 (b)(2) del Reglamento del Tribunal Supremo de Puerto Rico,

*supra*. **Es decir, -- a diferencia de la certificación interjurisdiccional --, la certificación intrajurisdiccional no se trata de una pregunta o consulta jurídica puntual con el fin asistir a otro foro que retenga la jurisdicción para resolver un caso ante sí, sino que consiste en, literalmente, traer ante nuestra consideración todas las controversias que estén pendientes ante un foro inferior dentro de nuestra jurisdicción, para subrogarnos en su lugar y resolver las mismas.** *Íd.* **Así pues, hemos expresado que este recurso es de carácter excepcional, pues la norma preferida en nuestro ordenamiento es que los casos maduren durante el trámite ordinario, evitando así que el foro de última instancia se inmiscuya a destiempo.** *Alvarado Pacheco y otros v. ELA*, 188 DPR 594 (2013); *UPR v. Laborde Torres*, 180 DPR 253, 272 (2010); *Rivera v. J.C.A.*, 164 DPR 1 (2005).

A su vez, este Alto Foro ha resuelto que el auto de certificación intrajurisdiccional es el mecanismo adecuado para atender asuntos que requieren una solución urgente, ya sea porque se afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención. *Alvarado Pacheco y otros v. E.L.A.*, *supra*; *UPR v. Laborde Torres*, *supra*; *Presidente de la Cámara v. Gobernador*, 167 DPR 149, (2006); *Rivera v. J.C.A.*, *supra*. Además, hemos señalado que dicho recurso nos permite dilucidar casos que, de otra forma, evadirían nuestros pronunciamientos. *Alvarado Pacheco y otros v. E.L.A.*, *supra*; *UPR v. Laborde Torres*, *supra*; *Presidente de la Cámara v. Gobernador*, 167 DPR 149

(2006). **En ese sentido, hemos precisado que, para determinar si procede expedir una certificación intrajurisdiccional, debemos considerar, entre otros, los siguientes factores: (1) la etapa procesal en la que se encuentre el litigio; (2) la complejidad de las controversias involucradas en el mismo; y (3) la necesidad que pueda existir de presentar prueba.** *Com. Elect. PPD v. CEE et al.*, 205 DPR 724 (2020); *Pierluisi et al. v. CEE et al.*, 204 DPR 841 (2020); *Senado de PR v. ELA*, 203 DPR 62 (2019).

Como se sabe, recientemente, este Tribunal dio paso a un recurso de este tipo, mediante el cual se nos peticionó certificar una acción recién presentada ante el foro primario, en la que se solicitó declarar la nulidad de cierta cláusula incluida en el contrato principal que inmunizaba a LUMA y a la Autoridad de Energía Eléctrica frente a reclamaciones por negligencia ordinaria. Esto último, bajo el fundamento de que dicha cláusula había sido otorgada de manera *ultra vires* e inconstitucional. Véase *Departamento de Asuntos del Consumidor v. LUMA Energy, LLC et al.*, 2025 TSPR 126, 216 DPR __ (2025). Al respecto, allí expusimos que, "[e]n virtud del recurso de certificación intrajurisdiccional [en cuestión], decidimos expedirlo por entender que [teníamos] ante nuestra consideración una controversia constitucional de alto interés público". *Íd.*, pág. 44. Cabe mencionar, sin embargo, que las controversias allí planteadas eran estrictamente de derecho, y ninguna de las causas de acción requerían un descubrimiento de prueba.

B.

Establecido lo anterior, conviene repasar aquí las normas relacionadas con la fragmentación de litigios y las reconvenciones compulsorias, por su impacto en las certificaciones intrajurisdiccionales que se nos solicitan y los desarrollos procesales ante el Tribunal de Primera Instancia en los casos de epígrafe.

i.

**De entrada, y sobre este último extremo, es menester señalar que, como regla general, en nuestra jurisdicción, impera el principio rector de evitar la litigación fragmentada de las controversias en un pleito.** *Zorniak Air Servs. v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992); *Vellón v. Squibb Mfg., Inc.*, 117 DPR 838, 857-858 (1986); *De Chabert v. Tribunal de Distrito*, 74 DPR 648 (1953). Véase, también, J. A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2.da ed., San Juan, Pubs. JTS, 2011, T. III., pág. 1135; 9 *Wright and Miller, Federal Practice and Procedure* Sec. 2388 (2026). Dicho de otro modo, los tribunales venimos llamados a desfavorecer, mas no a fomentar, la fragmentación de las controversias, a menos que ello sea estricta y realmente necesario para alcanzar una solución más justa, rápida y económica. *Íd.* **Por tal razón, hemos sentenciado que la segmentación de las cuestiones litigiosas resulta particularmente indeseable en aquellos casos en los que la prueba para resolver una controversia se relacione o sea pertinente para disponer de las otras.** *Vellón v. Squibb Mfg.,*

*Inc.*, *supra*, pág. 859; *Zorniak Air Servs. v. Cessna Aircraft Co.*, *supra*, pág. 180; Cuevas Segarra, *op. cit.*, págs. 1135-1136; *Wright & Miller*, *supra*, Sec. 2388.

ii.

**Ahora bien, -- muy estrechamente relacionado con el precitado principio fundamental de nuestro ordenamiento procesal civil --, se encuentra la figura de la reconvención compulsoria. Como se sabe, la Regla 11.1 de Procedimiento Civil,** *supra*, **dispone que se tendrá que presentar, por vía de reconvención, cualquier reclamación que la parte que la formula tenga en contra de cualquier otra parte adversa al momento de notificar dicha alegación, siempre que esta última: (1) surja del mismo acto, omisión o evento que motivó la reclamación de la parte adversa; y (2) no requiera, para su adjudicación, la presencia de terceros sobre quienes el tribunal no pueda adquirir jurisdicción.**

Sobre el particular, hemos señalado que este tipo de reconvención se denomina "compulsoria" u "obligatoria", debido a que, si no se presenta, se renuncia a la causa de acción que la motiva, y quedarán totalmente adjudicados los hechos y reclamaciones sin que el demandado pueda presentar posteriormente una reclamación que haya surgido de los mismos eventos, siéndole aplicable, por analogía, los efectos de la doctrina de cosa juzgada. *Consejo de Titulares v. Gómez Estremera et al.*, 184 DPR 407, 425 (2012); *S.L.G. Font Bardón v. Mini-Warehouse*, 179 DPR 322, 333 (2010); *Neca Mortg. Corp.*

*v. A & W Dev. S.E.*, 137 DPR 860, 867 (1995); *Sastre v. Cabrera*, 75 DPR 1, 3 (1953).

**Al estudiar la referida figura procesal, el tratadista Rafael Hernández Colón nos comenta que una "reconvención es compulsoria si existe una relación lógica entre la reclamación presentada en la demanda y la que es objeto de la reconvención; cuando los hechos esenciales de ambas reclamaciones están tan vinculados que la economía procesal <u>exige que se ventilen en conjunto</u>"**. (Énfasis suplido). R. Hernández Colón, *Práctica jurídica de Puerto Rico: Derecho Procesal Civil*, 6.ta ed., San Juan, Ed. LexisNexis, 2017, pág. 293. **Por su parte, el también tratadista José A. Cuevas Segara nos señala que, al realizar tal determinación, "debe establecerse en los hechos operativos una lógica relación con la reclamación del adversario", de modo que ambos petitorios involucren "controversias y partes sustancialmente idénticas"**. (Énfasis suplido). Cuevas Segarra, *op. cit.*, T. II, págs. 562-563.

Por último, conviene mencionar aquí que la reconvención compulsoria puede exponer reclamos contradictorios con las defensas afirmativas esgrimidas, pues esta alegación, al igual que la demanda, puede contener súplicas en la alternativa o inconsistentes entre sí. Cuevas Segarra, *op. cit.*, T. II, pág. 560, citando a *Keebler Co. Rovira Biscuit Corp.*, 624 F.2d 366, 373 esc. 7, (1er. Cir. 1980); y *Allstate Ins. Co. v. James*, 779 F.2d 1536 (11mo. Cir. 1986).

Es, pues, a la luz de la normativa antes expuesta que, -- desde la disidencia --, procedemos a disponer de los asuntos ante nos.

III.

Como mencionamos anteriormente, en la presente ocasión, se nos solicitó, en esencia, decidir si, -- en esta etapa de los procedimientos --, procedía, o no, acoger los recursos de certificación intrajurisdiccional instados en las causas de epígrafe. Evaluados, cuidadosa y detenidamente, los múltiples escritos presentados por las partes, entendemos que, -- contrario a lo que hoy decide una mayoría de este Tribunal --, denegar los referidos recursos de certificación intrajurisdiccional constituía el curso de acción más aconsejable y prudente para disponer de los asuntos que nos ocupan en esta etapa tan temprana de los procedimientos. Lo anterior es así, puesto que, conforme a la Regla 23 (b)(2) de este Alto Foro, *supra*, la expedición de las certificaciones intrajurisdiccionales de autos requiere traer, inmediatamente ante nuestra consideración, la totalidad de los litigios que se están dilucidando a nivel de instancia, lo que implica resolver las mencionadas reconvenciones compulsorias incoadas por LUMA.

**A nuestro juicio, las numerosas causas de acción reclamadas en éstas, -- las cuales, como señalamos, incluyen alegaciones de dolo, fraude, incumplimiento deliberado y de mala fe de obligaciones contractuales, *culpa in contrahendo*, abuso de poder, entre otras --, requieren la celebración de**

**un procedimiento de descubrimiento de prueba y la realización de las determinaciones de hechos correspondientes. Sin el beneficio de tales trámites, propios del foro primario como adjudicador de hechos, este Tribunal se arriesga a intervenir prematuramente en los litigios de autos. Ello, sin contar con los elementos fácticos necesarios para la correcta disposición de las múltiples y diversas controversias que ahora se encuentran envueltas en éstos.**

Sobre el particular, no nos convencen los argumentos planteados por P3 y el Gobierno de Puerto Rico respecto a que las reclamaciones de LUMA son contingentes o dependientes de la declaración de nulidad de la carta de extensión. De una lectura de las reconvenciones compulsorias aquí en cuestión, surge que podrían subsistir causas de acción indistintamente de la conclusión a la que se llegue en la controversia sobre la nulidad, por lo que limitarse a contestar únicamente dicha interrogante no dispondría de los presentes litigios. A modo de ejemplo, si se concluyera que la mencionada misiva es válida, podrían ser viables las causas de acción sobre cumplimiento específico, dolo en la ejecución del contrato y mala fe contractual. Asimismo, si se determinase que ésta es nula, pudiesen tener lugar las reclamaciones por dolo en la formación contractual, *culpa in contrahendo* y enriquecimiento sin causa.

Del mismo modo, tampoco coincidimos con P3 y el Gobierno de Puerto Rico en cuanto a que las reconvenciones objeto de los presentes litigios sean inmeritorias de su faz o que

carezcan de hechos alegados que las fundamenten. Al examinar los referidos escritos incluidos como anejos, vemos que LUMA expuso hechos específicos que, -- de ser probados en su día --, podrían sustentar sus reclamaciones.[9] Lo anterior, toda vez que dicha parte, a lo largo de sus alegaciones, hizo referencias a transcripciones de vistas públicas, documentos adjuntos, fotografías, admisiones de las partes constatadas en expedientes judiciales y administrativos, entre otros.

**Así pues, -- a la luz del derecho aplicable antes expuesto --, no nos parece deseable ni apropiado fraccionar los litigios de autos, en los que se han presentado reconvenciones compulsorias, a los fines de adjudicar solamente la controversia jurídica de la validez de la carta de extensión, divorciándola así del resto de reclamaciones y remedios presentados, los que involucran partes, hechos, prueba, defensas y argumentos legales comunes entre sí.**

En ese sentido, estamos convencidos de que, -- en esta etapa tan temprana de los procedimientos --, el curso de

---

[9] Sólo por mencionar alguno, podemos identificar que LUMA incluyó un extracto de la transcripción de la vista pública de la Junta de Gobierno de la Autoridad de Energía Eléctrica en la que se aprobó la carta de extensión aquí impugnada, de la que se desprende que el entonces director de dicha corporación pública y hoy director ejecutivo de P3, el Ing. Josué Colón Ortiz (en adelante, "ingeniero Colón Ortiz"), dijo que se estaba actuando "conforme a las leyes que fueron aprobadas por otras administraciones y que están en vigor". *Reconvención*, Caso Núm. SJ2025CV11093, Entrada Núm. 17 del Sistema Unificado de Manejo y Administración de Casos, pág. 87. A renglón seguido, dicha empresa incluyó otro extracto, de una transcripción de una vista pública ante la Cámara de Representantes celebrada el 21 de mayo de 2025, en la que el ingeniero Colón Ortiz manifestó que buscaba encaminar la declaración de nulidad del documento en cuestión, -- del cual había asegurado antes que cumplía con todos los requisitos de ley vigentes --, para "poder cumplir con la instrucción de la señora Gobernadora y el compromiso que la señora Gobernadora tiene". *Íd.*, pág. 88.

acción más adecuado y prudente hubiese sido el de denegar los recursos de certificación intrajurisdiccional de epígrafe. En nuestra opinión, tal proceder nos hubiese permitido: (1) contar con la prueba necesaria para la correcta disposición de todos los asuntos planteados, incluyendo la adjudicación de las defensas afirmativas relativas a la controversia principal sobre la nulidad contractual; (2) evitar un fraccionamiento improcedente e indeseable de los litigios de autos, especialmente, ante las reconvenciones compulsorias presentadas y la exigencia reglamentaria de elevar ante nos la totalidad de las controversias involucradas en los pleitos a certificarse de manera intrajurisdiccional; (3) y prevenir una intervención inoportuna y apresurada en un asunto de vital importancia para la estabilidad energética, económica y social del País.

Igualmente, somos de la opinión que, incluso si se entendiese que procedían las certificaciones aquí en cuestión, la celebración de una vista oral resultaba de vital importancia. Y es que, si algo queda claro en los recursos de epígrafe, es que subsisten más preguntas que respuestas. Preguntas para las que, -- más allá de las y los integrantes de este Alto Foro --, el Pueblo de Puerto Rico merece escuchar respuestas detallas y puntuales. Desafortunadamente, ello no ocurrirá en esta histórica ocasión.

Conocido es el antiguo proverbio que advierte que "donde no hay conocimiento, no hay bondad; y donde hay apuro, hay locura". Certificar los litigios de epígrafe sin antes haber

permitido presentar la evidencia requerida para la adecuada adjudicación de las controversias y defensas afirmativas planteadas en ellos, -- aunque éstos se fraccionen para sólo atender el asunto sobre la nulidad contractual --, a nuestro juicio, es actuar sin ese conocimiento fáctico necesario y con esa prisa engendradora de errores.

**Establecido lo anterior, queremos dejar meridianamente claro que el acercamiento que, en esta etapa de los procedimientos, le hacemos a los asuntos que hoy tenemos ante nuestra consideración es uno estrictamente procesal; entiéndase, decidir cuál es el foro adecuado para, -- en primera instancia --, dilucidar las controversias, de hecho y de derecho, aquí involucradas. En este momento, el juez que suscribe no pasa juicio sobre los méritos, o deméritos, de los planteamientos sustantivos que se esgrimen ante nos. Sobre ese extremo, en el momento oportuno y recibida la prueba de rigor, hubiésemos podido así hacerlo.**

IV.

Es, pues, por los fundamentos antes expuestos, que disentimos del curso de acción seguido por una mayoría de este Tribunal.

Ángel Colón Pérez
Juez Asociado